No. 26-1356

# In The United States Court of Appeals For the Seventh Circuit

PATRICK ATKINSON,

Plaintiff-Appellant,

v.

TODD W. BLANCHE, in his official capacity as Acting Attorney General of the United States, and ROBERT CEKADA, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court for the Northern District of Illinois The Hon. John Robert Blakey, District Judge Case No. 1:21-CV-291

APPELLANT'S BRIEF AND REQUIRED SHORT APPENDIX

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

Exh. "B"

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1356</u>

Short Caption: <u>Patrick Atkinson v. Pamela Bondi, in her official capacity, et al</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Patrick Atkinson</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Law Firm of David G. Sigale, P.C.</u>

(3)     If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

         <u>N/A</u>

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     <u>N/A</u>

---

Attorney's Signature: <u>/s/ David G. Sigale</u>     Date: <u>March 9, 2026</u>

Attorney's Printed Name: <u>David G. Sigale</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓] **No** [ ]

Address: <u>55 West 22nd Street, Suite 230</u>

         <u>Lombard, IL 60148</u>

Phone Number: <u>630.452.4547</u>     Fax Number: <u>630.596.4445</u>

E-Mail Address: <u>dsigale@sigalelaw.com</u>

rev. 12/19 AK



# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on _____March 9, 2026_____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/_____David G. Sigale_____

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:

address:

s/_____

TABLE OF CONTENTS

Table of Contents ……………………………………………………….. i

Table of Authorities ……………………………………………….. iii

Jurisdictional Statement …………………………………………….1

Statement of Issues …………………………………………… 2

Statement of the Case ………………………………………… 3

      The Challenged Statute ………………………………… 4

      Procedural History …………………………………………5

      The District Court's Decision ………………………….… 6

Summary of Argument ………………………………………….. 6

Argument………………………………………………………... 9

I.     THE COURT'S REVIEW IS DE NOVO………………………………… 9

       Standard for Reviewing an F.R.Civ.P. 12(b)(6) Motion ……. 9

II.    SECTION 922(g)(1) IS UNCONSTITUTIONAL AS TO
       NON-VIOLENT FELONS …………………………………..…11

III.   FELONS – INCLUDING NON-VIOLENT FELONS - ARE
       INCLUDED AMONG "THE PEOPLE" WITHIN THE SCOPE OF
       THE SECOND AMENDMENT ………………………………...… 13

IV.    *HELLER'S* PRESUMPTIVELY VALID FELON FIREARM BAN MEANS THAT SOME FELONS MUST BE ABLE TO OVERCOME THE PRESUMPTION ...................................... 16

V.    NON-VIOLENT FELONS WERE NOT HISTORICALLY PROHIBITED FROM EXERCISING SECOND AMENDMENT RIGHTS ............................................................................ 28

VI.    THE SUPREME COURT'S *RAHIMI* DECISION MAKES CLEAR THE PROPER FOCUS IS ON DANGEROUSNESS ................ 61

VII.    PLAINTIFF'S AS-APPLIED CHALLENGE SHOULD SUCCEED BECAUSE HE CAN DEMONSTRATE THAT – DESPITE HIS CONVICTION - HE IS A NON-DANGEROUS PERSON ......... 64

CONCLUSION ............................................................................. 69

# TABLE OF AUTHORITIES

**Cases**

*Abcarian v. McDonald,*
617 F.3d 931 (7th Cir. 2010) ……………………………,,,,,,,,,,……….. 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) …………………………………………….….. 10

*Atkinson v. Garland,*
70 F.4th 1018 (7th Cir. 2023) …………………………….… 17, 18, 45, 46

*Atwater v. City of Lago Vista,*
532 U.S. 318 (2001) ……………………………………………….52

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) …………………………………………….. 8

*Baer v. Lynch,*
636 F. App'x 695 (7th Cir. 2016) …………………………………… 25

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) …………………………………………….. 10

*Binderup v. Att'y Gen. United States of Am.,*
836 F.3d 336 (3d Cir. 2016) …………..................... 8, 15, 20, 23, 33, 35, 40

*Borden's Farm Products Co. v. Baldwin,*
293 U.S. 194 (1934) ……………………………………………. 20

*Cont'l Cas. Co. v. Staffing Concepts, Inc.,*
538 F.3d 577 (7th Cir. 2008) ……………………………………… 22

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................................................... *passim*

*Erickson v. Pardus,*
551 U.S. 89 (2007) .............................................................….. 10

*Evans v. Cook County State's Attorney,*
2021 IL 125513 .............................................................…... 16

*Folajtar v. AG of the United States,*
980 F.3d 897 (3rd Cir. 2020) ……….………..…… 32, 36, 37, 42,44, 50, 54

*Fortson v. L.A. City Attorney's Office,*
852 F.3d 1190 (9th Cir. 2017) ............................................... 23

*Hatfield v. Barr,*
925 F.3d 950 (7th Cir. 2019) …….........................……… 24, 66

*Hill v. State,*
53 Ga. 472 (1874) ..............................................…......45

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) …….......................…...… *passim*

*Landmark Am. Ins. Co. v. Hilger,*
838 F.3d 821 (7th Cir. 2016) .............................…........…… 9

*Lange v. California,*
141 S. Ct. 2011 (2021) ............................................…..... 15

*Lewis v. United States,*
445 U.S. 55 (1980) ..................…............................…........ 64

*Logan v. United States,*
552 U.S. 23 (2007) ......................…......................…........ 21

iv

*McCready v. eBay, Inc.,*
453 F.3d 882 (7th Cir. 2006) ....................................................... 9

*Marquez v. Weinstein, Pinson & Riley, P.S.,*
836 F.3d 808 (7th Cir. 2016) ....................................................... 9

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ................................................... 7, 11, 29

*Medina v. Whitaker,*
913 F.3d 152, 154 (D.C. Cir. 2019) ........................................ 26, 39

*Morrison v. Olson,*
487 U.S. 654 (1988) ................................................... 38

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ........................................... *passim*

*Range v. AG United States,*
124 F.4th 218 (3rd Cir. 2024) (*Range II*) ................... 13, 14, 15, 30, 41,
42, 46, 48, 55, 56, 57, 60

*Rummel v. Estelle,*
445 U.S. 263 (1980) ................................................... 39

*Scarborough v. United States,*
431 U.S. 563 (1977) ................................................ 58, 59, 64

*Sir John Knight's Case,*
87 Eng. Rep. 75 (K.B. 1686) ................................................ 49, 67

*State v. Huntly,*
25 N.C. 418 (1843) ................................................ 62

*Tamayo v. Blagojevich,*
526 F.3d 1074 (7th Cir. 2008) ...................................................... 11

*United States v. Atkinson,*
1:98-cr-00730-03 .......................................................................... 2

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013) ..................................................... 35

*United States v. Coleman,*
609 F.3d 699 (5th Cir. 2010) ....................................................... 41

*United States v. Donald,*
2024 U.S. Dist. LEXIS 82487 (N.D. Ill. 2024) ...................................13

*United States v. Gay,*
98 F.4th 843 (7th Cir. 2024) ........................................... 13, 16, 17, 68

*United States v. Griffin,*
704 F. Supp. 3d 851 (N.D. Ill. 2023) ............................................. 65

*United States v. Holden,*
70 F.4th 1015 (7th Cir. 2023) ...................................................... 68

*United States v. Jackson,*
121 F.4th 656 (8th Cir. 2024) ...................................................... 23

*United States v. Marcavage,*
609 F.3d 264 (3rd Cir. 2010) ........................................................ 8

*United States v. McCane,*
573 F.3d 1037 (10th Cir. 2009) ........................................ 30, 31, 32

*United States v. Meza-Rodriguez,*
798 F.3d 664 (7th Cir. 2015) ....................................................... 36

*United States v. Phillips,*
2023 U.S. Dist. LEXIS 230181 (N.D. Ill. 2023) ........................... 13, 43

*United States v. Prince,*
700 F. Supp. 3d 663 (N.D. Ill. 2023) ...................................... 43, 47, 56

*United States v. Rahimi,*
602 U.S. 680 (2024) ...................................................... *passim*

*United States v. Shields,*
789 F.3d 733 (7th Cir. 2015) .................................................. 25

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) .................................................. 25

*United States v. Stanko,*
491 F.3d 408 (8th Cir. 2007) .................................................. 41

*United States v. Torres,*
789 Fed. Appx. 655 (9th Cir. 2020) ........................................... 19

*United States v. Torres-Rosario,*
658 F.3d 110 (1st Cir. 2011) .................................................. 22

*United States v. Warner,*
131 F.4th 1137 (10th Cir. 2025) .............................................. 30

*United States v. Williams,*
113 F.4th 637 (6th Cir. 2024) ................................................ 19

*United States v. Williams,*
616 F.3d 685 (7th Cir. 2010) ............................................. 19, 24, 25

*United States v. Woolsey,*
759 F.3d 905 (8th Cir. 2014) ................................................. 22

vii

*Vincent v. Bondi,*
127 F.4th 1263 (10th Cir. 2025) ................................................ 30

*Wigod v. Wells Fargo Bank, N.A.,*
673 F.3d 547 (7th Cir. 2012) ................................................. 10

*Zherka v. Bondi,*
140 F.4th 68 (2d Cir. 2025) ................................................... 47

## Statutes, Rules, and Ordinances

U.S. Const. Amend. II ................................................*passim*

18 U.S.C. § 921(a)(20) ...............................................................40

18 U.S.C. § 922(g)(1) ........................................... *passim*

18 U.S.C. § 925(c) .............................................................. 20, 23

18 U.S.C. § 1464 ...................................................................... 37

*Omnibus Crime Control and Safe Streets Act of 1968,*
Pub. L. No. 90-351, tit. VII, § 1202, 82 Stat. 197 ........................... 59

*An Act to Strengthen the Federal Firearms Act,*
Pub. L. No. 87-342, 75 Stat. 757 (1961)
H.R. Rep. No. 87-1202 (1961) ................................................ 59

*Federal Firearms Act,* Pub. L. No. 75-785, 52 Stat. 1250 (1938) ......... 58

Fed. R. Civ. P. 8(a)(2) ........................................................... 10

F.R. Civ. P. 12(b)(6) ................................................ 1, 3, 5, 6, 9

430 ILCS 65/10 …………………………………………..……16

720 ILCS 5/2-8 ………………………………………….……16

1786 Mass. Laws 265 ………………………………………….. 58

N.J. Stat. Ann. § 2C:39-7 …………………………………….… 32

N.J. Stat. Ann. § 2C:40-17(a) (West 2010) ……………….…..……………37

N.J. Stat. Ann. §, 2C:43-6.a(3) (West 2010) …………………………….. 37

Act of Dec. 21, 1771, ch. 540, N.J. Laws 343-344 ………….…..………… 57

Act of Apr. 20, 1745, ch. 3, N.C. Laws 69-70 …………………………57

18 Pa. Const. Stat. Ann. § 6105(b) …………………………………………32

Laws and Ordinances of New Netherland, 1638-1674 (1868) …………. 47

## Other Authorities

Mark W. Bennett, Justin D. Levinson, & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 989 (2017) ……………………………………………….. 33, 34

4 William Blackstone,
*Commentaries on the Laws of England* (1769) …………….. 15, 54, 62, 63

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139 (2007) ……………………...... 49

Michael Dalton, *The Country Justice* 9 (1727) …………………………… 52

1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) ........... 51

Gary Fields & John R. Emshwiller, *Many Failed Efforts To Count Nation's Federal Criminal Laws*, WALL ST. J. (July 23, 2011) .......... 39

Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993) ...................................................... 54

G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273 (1899) …....................................……........... 50

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020) ....................................................... 44

Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16:1 Drexel L. Rev. 70-71 (2023) ................................................. 48

Serjeant William Hawkins, 1 *Pleas of the Crown* 136 (1716) ........... 21

1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773) ……........................................................... 49

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339 (2008) .................................................. 38

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ....................................….......... 31

Sanford Levinson, *Comment on Ruben and Blocher: Too Damn Many Cases, and an Absent Supreme Court,* 68 DUKE L.J. ONLINE 17 (2018) ................................................. 40

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?,* 32 Harv. J.L. & Pub. Pol'y 695 (2009) .........................................31, 48, 49

Paul H. Robinson *et al., The Modern Irrationalities of American Criminal Codes: An Empirical Study of Offense Grading,* 100 J. Crim. L. & Criminology 709 (2010) ...................................... 37

Paul H. Robinson *et al., Report on Offense Grading in New Jersey* 3 (2011) ...................................................................... 37

2 Bernard Schwartz, *The Bill of Rights: A Documentary History,* 675 (1971) ........................................................................ 51, 52

Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban In a Post-Heller World,* 70 Duke L.J. 1429, 1451-52 (2021) ...................................... 38, 39, 41

William J. Stuntz, *The Pathological Politics of Criminal Law,* 100 Mich. L. Rev. 505 (2001) ....................................................... 37

David Weisburd and Ellen Chayet, *White Collar Crime and Criminal Careers: A Final Report Submitted to the National Institute of Justice* (1993) ............................................................. 68

Adam Winkler, *Heller's Catch 22,* 56 UCLA L. Rev. 1551 (2009) ........31

*Records Of The Colony Of New Plymouth, in New England,* at 243 (1856) ........................................................................... 47

## APPELLANTS' BRIEF

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant ("Plaintiff") seeks reversal of the District Court's grant of an F.R. Civ. P 12(b)(6) Motion to Dismiss in favor of the Defendants-Appellees (collectively, "Defendants"), and seeks—under the Second and Fourteenth Amendments to the United States Constitution - declaratory judgment and a permanent injunction barring enforcement of 18 U.S.C. § 922(g)(1) as-applied to him individually - thus restoring Plaintiff's rights under the Second Amendment. The District Court had jurisdiction under 28 U.S.C. § 1331, 1343, 2201 and 2202.

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court rendered a final judgment granting the Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss.

i.    The order sought to be reviewed was rendered February 6, 2026.  *See* Short Appendix 1 ("SA"). The accompanying Opinion was issued on February 9, 2026.  SA2.

ii.    There were no other orders tolling the time in which to

appeal.

iii.    The Notice of Appeal was filed February 12, 2026. SA32.

STATEMENT OF ISSUES

1.    Did the district court commit reversible error by dismissing the Plaintiff's Complaint after holding that Plaintiff, an individual convicted of a Class C non-violent federal felony (*United States v. Atkinson*, 1:98 cr 00730-03), who was sentenced to two years of probation with six months of home confinement, a fine of $15,000.00, and 200 hours of community service, and who completed all his sentencing terms, and had his probation terminated a year early without objection from the Government more than twenty years ago, and who has lived a peaceful and law-abiding existence ever since, categorically lies outside Second Amendment protection and likewise cannot be afforded the opportunity to prove he deserves Second Amendment protection?

2.    Is 18 U.S.C. § 922(g)(1) unconstitutional facially as to non-

violent felons and/or as-applied to Plaintiff, individually, as the felon disarmament law is not supported by the historical record, and is far overbroad of the important and pertinent question of dangerousness?

## STATEMENT OF THE CASE

On February 6, 2026, the District Court granted the Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss, holding that 18 U.S.C. § 922(g)(1) was constitutional both facially and as-applied to Plaintiff under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), even though case law has recognized that some person's circumstances may allow that person to bring a successful as-applied Second Amendment claim, and even though Plaintiff was afforded no opportunity to prove that his as-applied challenge to 18 U.S.C. § 922(g)(1) fell outside the presumptively-lawful parameters as stated in *District of Columbia v. Heller*, 554 U.S. 570, 626, fn.26 (2008), and that Plaintiff is a non-dangerous person who deserves to have his Second Amendment rights restored.

Because the District Court misinterpreted and misapplied the

3

*Bruen* historical analysis, especially the impact of *United States v. Rahimi*, 602 U.S. 680 (2024), the dismissal of Plaintiff's Amended Complaint must be reversed.

### The Challenged Statute

18 U.S.C. § 922(g)(1) states as follows:

> (g)    It shall be unlawful for any person—
>
> (1)    who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 921(a) states in relevant part:

> (20)    The term "crime punishable by imprisonment for a term exceeding one year" does not include—
>
> (A)    any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
>
> (B)    any State offense classified by the laws of the State as a misdemeanor and punishable by a

4

term of imprisonment of two years or less.

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

## Procedural History

Plaintiff filed his Complaint in the District Court as Case No. 1:21-cv-291 on January 18, 2021. The Defendants moved to dismiss that complaint under F.R. Civ. P. 12(b)(6). The District Court granted Defendant's Motion on March 15, 2022, and Plaintiff timely appealed to this Court as Case No. 22-1557. On June 20, 2023, this Court vacated the District Court's dismissal and remanded with instructions.

On remand, Plaintiff filed an Amended Complaint on August 9, 2023. After a stay of proceedings was entered and lifted, the Defendants moved to dismiss the Amended Complaint under F.R. Civ. P. 12(b)(6) on

July 15, 2024.

## The District Court's Decision

On February 6, 2026, the district court issued an Order granting Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint with prejudice (SA1). The district court issued an accompanying Opinion explaining its decision (SA2). The District Court then entered judgment for the Defendants on February 9, 2026 (SA1).

## SUMMARY OF ARGUMENT

The district court's dismissal is flawed in two fundamental respects: the district court committed reversible error by misinterpreting and misapplying the holdings in *Bruen* and *Rahimi*, and because the challenged statute categorically bars non-violent felons from even seeking to have their Second Amendment rights restored, no matter their individual circumstances, the statute unconstitutionally violates the Supreme Court's holding in *Heller*, 554 U.S. at 636.

The district court simultaneously held that (1.) Plaintiff is not entitled to any sort of evidentiary hearing to determine if he qualifies to

have his rights restored, and (2.) based solely on the allegations in Plaintiff's Complaint, that he does not so qualify.

The Supreme Court stated in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592; *see also McDonald*, 561 U.S. at 767. This comports with *Heller*'s holding that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." *Heller*, 554 U.S. at 635 (emphasis added).

Two years after *Heller*, the Supreme Court reminded the lower courts that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780.

In relevant part, Plaintiff is challenging the constitutionality of 18 U.S.C. § 922(g)(1) as applied to him. One person. One person, who the Defendants believe is so bent on felonious recidivism, and with a firearm this time, apparently, that he would go to the extraordinary

7

lengths of filing a federal lawsuit and appeal(s) just for the purpose of having his rights restored so that he would be able to obtain that firearm, so that he can then – finally – go out and commit a violent gun crime.

"[A]n as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.' *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 345-46 (3rd Cir. 2016) (*en banc*) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3rd Cir. 2010)); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another"); *see also Schrader v. Holder*, 704 F.3d 980, 989-90, 991 (D.C. Cir. 2013) (differentiating between analysis of 18 U.S.C. § 922(g)(1) "as applied" to all common-law misdemeanants, which the Court discussed, and individual as-applied analysis, declining to conduct the latter because issue was deemed waived).

It is not just bad policy to presume that a person is no better than

their worst moment – no matter how non-violent or how long ago, even if that presumption surely applies to some people. But without affording the individual to show any evidence of change and growth, the presumption is dehumanizing and unreasonable.

Defendants' Motion to Dismiss should have been denied, and the lower court must be reversed.

## ARGUMENT

### I. THE COURT'S REVIEW IS *DE NOVO*.

Because this Court reviews a judgment granting a motion to dismiss for failure to state a claim, this court reviews that judgment *de novo. See, e.g., Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016); *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010); *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

### Standard for Reviewing an F.R. Civ. P. 12(b)(6) Motion

Generally, a dismissal pursuant to Rule 12(b)(6) is appropriate only if there is no set of facts consistent with the pleadings under which the plaintiffs could obtain relief. *See Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 812 (7th Cir. 2016). The Court ". . . must

accept as true all factual allegations in the complaint. *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 [ ].

Under the federal rules' notice pleading standard, a complaint must contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). The complaint will survive a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,___, [ ] (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 [ ] (2007). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.*" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012).

A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp.*, 550 U.S. at 556. The Court should construe the complaint in the light most favorable to the plaintiffs accepting as true all well-pleaded facts alleged, and drawing

10

all possible inferences in their favor. *See Tamayo v. Blagojevich*, 526

F.3d 1074, 1081 (7th Cir. 2008).

## II. SECTION 922(g)(1) IS UNCONSTITUTIONAL AS TO NON-VIOLENT FELONS.

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep

and bear Arms, shall not be infringed." *District of Columbia v. Heller*,

554 U.S. 570, 634 (2008).

The Supreme Court stated that the Second Amendment

"guarantee[s] the individual right to possess and carry weapons in case

of confrontation." *Id.* at 592; *see also McDonald*, 561 U.S. at 767-68.

"Constitutional rights are enshrined with the scope they were

understood to have when the people adopted them, whether or not

future legislatures or (yes) even future judges think that scope too

broad." *Heller*, 554 U.S. at 634-635.  The Second Amendment "is fully

applicable against the States." *McDonald*, 561 U.S. at 791.

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the

Supreme Court held that when analyzing Second Amendment

11

challenges "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24.

The *Bruen* Court discussed how it found in *Heller* that the Second Amendment right is not unlimited, but reiterated that in *Heller* the Court was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 21 (quoting *Heller*, 554 U.S. at 627).

Plaintiff is not arguing that 18 U.S.C. § 922(g)(1) is facially unconstitutional as to **all** felons; certainly there are felons to whom the statute properly applies.

However, the historical record does not constitutionally support the permanent disarmament of non-violent felons such as Plaintiff, and

12

the district court erred in holding otherwise. Having said that, even though the required *Bruen* analysis as regards non-violent felons may affect many such people, Plaintiff is only seeking relief for himself. Whether the Court considers Plaintiff's claim an as-applied challenge or a hybrid partial facial/as-applied challenge, the *Bruen* analysis is the same, and none of the district court's citations on the subject obviate the need to apply *Bruen* to this case:

> The Justices have yet to consider the question whether non-violent offenders may wage as-applied challenges to §922(g)(1) . . . We may assume for the sake of argument that there is some room for as-applied challenges . . . .

*United States v. Gay*, 98 F.4th 843, 846-47 (7th Cir. 2024).

## III.   FELONS – INCLUDING NON-VIOLENT FELONS - ARE INCLUDED AMONG "THE PEOPLE" WITHIN THE SCOPE OF THE SECOND AMENDMENT.

The district court was correct that plaintiff is one of "the people" covered by the Second Amendment. *See United States v. Phillips*, 2023 U.S. Dist. LEXIS 230181 [ ] at *6 (N.D. Ill. 2023); *see also United States v. Donald*, 2024 U.S. Dist. LEXIS 82487 (N.D. Ill. 2024), *Range v. AG United States,* 124 F.4th 218, 226-28 (3rd Cir. 2024) (*Range II*), though

13

as the district court assumed the conclusion without deciding it (Dkt., #71, p.6, fn.1), Plaintiff believes further explanation for this Court is prudent.

In *Heller*, the Court insisted that "the people" referred to in the Second Amendment were identical to "the people" protected by the First, Fourth, and Ninth Amendments. And these "people," according to the Court, "unambiguously" included "all members of the political community, not an unspecified subset. *Heller*, 554 U.S. at 579-80. "So the Second Amendment right, *Heller* said, presumptively "belongs to all Americans."' *Range II*, 69 F.4th at 101 (quoting *Heller*, 554 U.S. at 581).

The *Range II* Court listed four reasons why he was part of "the people" despite his conviction, all of which are correct:

- "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to "law-abiding, responsible citizens" were dicta. *Range II*, 69 F.4th at 101.

- "other Constitutional provisions reference 'the people.' . . . Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as

14

well. *See* 554 U.S. at 580. And we see no reason to adopt an inconsistent reading of 'the people.'" *Id.* at 101-02.

- "'That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical.' [*Binderup*,] 836 F.3d at 344 (Ambro, J.). That statement tracks then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that 'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).

- "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague . . . We are confident that the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment. Perhaps, then, the category refers only to those who commit 'real crimes' like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. 4 William Blackstone, *Commentaries on the Laws of England* 54 (1769). But today, felonies include a wide swath of crimes, some of which seem minor. And some misdemeanors seem serious. As the Supreme Court noted recently: 'a felon is not always more dangerous than a misdemeanant.' *Lange v. California*, 141 S. Ct. 2011, 2020 (2021) (cleaned up). As for the modifier 'responsible,' it serves only to undermine the Government's argument because it renders the category hopelessly vague." *Range II*, 69 F.4th at 102.

This last is exactly the point relied on in *Rahimi* to reject any argument that Plaintiff is not of "the people" for Second Amendment purposes.

15

**IV.** *HELLER'S* PRESUMPTIVELY VALID FELON FIREARM BAN MEANS THAT SOME FELONS MUST BE ABLE TO OVERCOME THE PRESUMPTION.

*Heller* did not involve the issue of this case – namely, the ability of non-violent felons to raise as-applied challenges to the firearm prohibition of 18 U.S.C. § 922(g)(1), which, as the Seventh Circuit noted in both *Gay*, 98 F.4th at 846-47 and *Kanter*, 919 F.3d at 447, has not yet been historically determined.

While the recognition of the individual Second Amendment right itself was the key holding of *Heller*, it was a passage within that led to the issue of this appeal, and has led to the disenfranchisement of Plaintiff, a non-violent federal[1] felon from long ago. As this Court noted in *Kanter*, 919 F.3d at 441:

> The [*Heller*] Court also made clear that "the right secured by the Second Amendment is not unlimited." *Id*. at 626. Although the Court did not "undertake an

---

[1] Had Plaintiff's felony conviction been in an Illinois state court, Plaintiff would have been able to immediately seek restoration of his firearm rights under Section 10 of the Illinois Firearm Owners Identification Act (430 ILCS 65/10). Even if his felony had been a violent "forcible felony" (as that term is defined in 720 ILCS 5/2-8), which it was not, he would still be able to seek restoration of his firearm rights after a wait of 20 years following the conviction or end of incarceration, if any. 430 ILCS 65/10(c)(1). *See Evans v. Cook County State's Attorney*, 2021 IL 125513, *P35. This does not mean the request would have been granted, but he would still be able to have his request heard.

exhaustive historical analysis ... of the full scope of the Second Amendment," it said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* It described such prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

"We may assume for the sake of argument that there is some room for as-applied challenges." *Gay*, 98 F.4th at 846. While *Gay* is instructive for so holding, it is otherwise not comparable on its facts, as that defendant had been convicted of 22 felonies, some violent, *plus* he had agreed for his parole not to possess a firearm, *plus* he did not challenge Section 922(g)(1) with a declaratory action, but by breaking the law and hoping to evade capture. *Gay*, 98 F.4th at 847.

*Gay* also came after *Atkinson* remanded this matter for a fuller discussion on § 922(g)(1)'s constitutionality under *Bruen* (*see Atkinson*, 70 F.4th at 1022), but *Gay* did not mention *Atkinson* at all, instead incorrectly describing § 922(g)(1) as a law where the *Heller* Court "pointedly stated that 'longstanding prohibitions on the possession of firearms by felons' are valid." *Gay*, 98 F.4th at 846, while ignoring that the *Heller* Court called them only "presumptively lawful," (*Heller*, 554

17

U.S. at 627, n.26), and that the *Heller* Court explicitly stated it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

In the first appeal in this matter, the Government urged this Court to take that footnote to its extreme and equate "presumptively" with "always", but this Court rejected that request. "'Nothing allows us to sidestep *Bruen* in the way the government invites." *Atkinson*, 70 F.4th at 1022; *see also id.* ("We must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length."). The Court in *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (*en banc*) , cited by the district court, did not do this, only giving lip service to *Bruen*'s required rigorous analysis, and therefore should not be persuasive to this Court now. The district court's reliance on these cases, expending them and "plac[ing] more weight on these passing references than the [*Heller*] Court itself did," *Kanter*, 919 F.3d 437, 445 (7th Cir. 2019), was reversible error.

"Presumptions require an actor '[t]o take for granted as being true in the absence of proof to the contrary' the matter presumed. American

18

Heritage Dictionary (5th ed. 2016) (definition of 'presume'). In other words, presumptions may be rebuttable. While words in a judicial opinion — as opposed to a statute — should not be scrutinized with a gimlet eye, the Supreme Court's use of the word 'presumptively' in *Heller* at least suggests that as-applied challenges based on the Second Amendment may be permissible." *United States v. Torres*, 789 Fed. Appx. 655, 657-658 (9th Cir. 2020).

"*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). *See also Duarte*, 137 F.4th at 782 (VanDyke, J., dissenting) (" '[A]pplying *Heller*'s dicta uncritically,' . . . is 'at odds with *Heller* itself, which stated courts would need to 'expound upon the historical justifications' for firearm-possession restrictions when the need arose.'" (citing *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024) (quoting *Heller*, 554 U.S. at 635)).

"Unless flagged as irrebutable, presumptions are rebuttable."

19

*Binderup*, 836 F.3d at 350 (Ambro, J.). "A presumption of constitutionality 'is a presumption . . . [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption.'" *Id.* at 361 n.6 (Hardiman, J., concurring) (quoting *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 209 (1934)).

> [W]e doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is *presumptively* lawful.

*Id.* (internal quotation marks omitted).

However, as this Court knows, Plaintiff has nowhere else to go to seek relief. 18 U.S.C. § 925(c) permits an applicant such as Plaintiff to make an application to the Attorney General to remove Plaintiff's firearm prohibitor and restore his Second Amendment rights if he establishes "that the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

However, since 1992, "Congress has repeatedly barred the Attorney General from using appropriated funds to investigate or act upon [such relief] applications," thus rendering the provision "inoperative." *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (quotation marks omitted).

Notably, the statute also provides that "[a]ny person whose application for relief from disabilities is denied by the Attorney General may file a petition with the United States district court for the district in which he resides for a judicial review of such denial. The court may in its discretion admit additional evidence where failure to do so would result in a miscarriage of justice. Plaintiff asserts that the failure to conduct the hearings in the first place constitutes a constructive denial allowing for judicial review. In a Federal Arbitration Act case, this Court noted:

> A showing of unjustifiable delay coupled with irreparable injury if an immediate appeal is not allowed is enough to make a constructive denial appealable, if a formal denial would be. . . . Maybe a showing of delay at once inordinate and unjustified, [ ] . . . is also enough. Otherwise the lower court or agency would have the judicial or administrative equivalent of

a pocket veto.

*Cont'l Cas. Co. v. Staffing Concepts, Inc.*, 538 F.3d 577, 580-581 (7th Cir. 2008). When it comes to constitutional rights, Congress should not be able to extinguish any hope of restoration through the budget. Plaintiff should have the ability to be heard somewhere.

Other Courts have agreed with this principle. "[T]he Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," or, phrased differently, "the Supreme Court might find some felonies so tame and technical as to be insufficient to justify [a firearms] ban." *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). The Eighth Circuit rejected an as-applied challenge to Section 922(g)(1) where the felon "has not shown that he is 'no more dangerous than a typical law-abiding citizen." *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (internal quotation marks omitted).

The Ninth Circuit rejected an as-applied challenge from a domestic violence misdemeanant when he "alleged no other facts about himself and his background that would distinguish him from any other

22

domestic violence misdemeanant." *Fortson v. L.A. City Attorney's Office*, 852 F.3d 1190, 1994 (9th Cir. 2017). The *Fortson* Court went on to hold "that a plaintiff must allege facts that distinguish him from the typical person the ban applies to in order to state an as applied claim." *Id.* (citing *Binderup*, 836 F.3d at 346).

Additionally, the D.C. Circuit noted that without administrative relief, such as that referenced in 18 U.S.C. § 925(c):

> the federal firearms ban will remain vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a law-abiding, responsible citizen entitled to use arms in defense of hearth and home.

*Schrader*, 704 F.3d at 992 (internal quotation marks and punctuation omitted).

To be sure, some Circuits, as the district court below, have all but held that the presumptive felon firearm ban really means "absolute ban." However, "[m]aking the leap from *presumptively* constitutional to *always* constitutional ... is too much for that overused line to bear, no matter how you read it." *United States v. Jackson*, 121 F.4th 656, 658 (8th Cir. 2024) (Stras, J., dissenting). As described in more detail below,

23

Plaintiff asserts the district court erroneously strayed from the logical truism noted in *Williams*. Plaintiff asserts that it is not incompatible with *Heller* to assert that *some* persons must be sufficiently at the margins that the concerns about dangerousness and public safety that motivated 18 U.S.C. § 922(g)(1) simply no longer apply.

The district court opinion found that 18 U.S.C. § 922(g)(1) affords Plaintiff no opportunity to receive an individualized as-applied adjudication of his Second Amendment claim. The district court based its dismissal, at least partly, on that finding.

But this Court in *Kanter* noted that "[t]here may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case." *Kanter*, 919 F.3d at 443. *Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019) also noted this possibility ("someone who wants us to carve out particular felonies (or felons) from a category that the Supreme Court has said is presumptively valid must supply an adequate basis for that distinction"), as did *Williams*, 616 F.3d at 692 ("there must exist the possibility that the ban could be unconstitutional

24

in the face of an asapplied challenge.").

And without affording Plaintiff any opportunity to address the issue with evidence and/or testimony, the district court committed reversible error.

This Court in *Kanter*, 919 F.3d at 443, listed four previous examples of unsuccessful plaintiffs in as-applied Second Amendment cases: *Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016) (individual convicted of felony robbery); *United States v. Shields*, 789 F.3d 733, 750-51 (7th Cir. 2015) (individual who had been convicted of three violent felonies); *Williams*, 616 F.3d at 693-94 (individual convicted of felony robbery who "beat[] the victim so badly that the victim required sixty-five stitches"); and *United States v. Skoien*, 614 F.3d 638, 642, 644 (7th Cir. 2010) (*en banc*) (domestic violence misdemeanant because violence was "an element of the offense" and data suggested high rates of recidivism).

If the above-cited cases are the benchmark (three of the cases were themselves appeals of criminal convictions of unlawful gun possession, thus belying any claim of law-abidingness, while one had

25

recently finished his sentence for robbery), and everyone is equated to those individuals, then it is no wonder that Plaintiff's claim was rejected out-of-hand. But Plaintiff should have the opportunity to show he is not of that character and overcome the presumption.[2] *See, e.g., Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019). "[I]t may be possible for a felon to show that his crime was so minor or regulatory that he did not forfeit his right to bear arms by committing it ...." *Id.*

Plaintiff is no threat to anyone, and never has been. He asserts he can prove it if given the chance.

The district court erred in its analysis as to exclude Plaintiff from having any rights under the Second Amendment, and that Plaintiff is disallowed from even attempting to prove he belongs in the protected category, and that the presumption against him as noted in *Heller* is overcome by his personal circumstances (SA11). For that reason *alone,*

---

[2] For example, in *Schrader*, the plaintiff was a Navy veteran convicted of common-law misdemeanor assault and battery in Maryland in 1968, served no jail time, and only had a traffic ticket since, but was barred under Section 922(g)(1) because the crime was punishable by more than two years. The D.C. Circuit noted that "[t]o the extent that these allegations are true, we would hesitate to find Schrader outside the class of 'law-abiding, responsible citizens' whose possession of firearms is, under *Heller*, protected by the Second Amendment. *Heller*, 554 U.S. at 635." *Schrader*, 704 F.3d at 991. The Court did not reach the issue, however, holding that the issue was waived for not being argued in the district court. *Id.*

26

its ruling granting the Defendants' Motion to Dismiss should be reversed and remanded, so that the district court can determine – after actually considering Plaintiff's testimony, witnesses, and evidence - whether the Second Amendment applies to an individual like Plaintiff, who unwittingly committed a non-violent federal felony twenty-eight years ago, and as to whom every bit of evidence would show he is a law-abiding and productive member of society, who presents no risk of dangerousness to himself, others, or the community at large. Such person should fall within the guarantee of the Second Amendment and be allowed to defend himself with a firearm in his home, as mandated by *Heller*, if only he were allowed to present his case.

By erroneously dismissing Plaintiff's Amended Complaint without at least allowing Plaintiff to introduce a record to determine Plaintiff's actual level of dangerousness, the district court committed reversible error.

## V.  NON-VIOLENT FELONS WERE NOT HISTORICALLY PROHIBITED FROM EXERCISING SECOND AMENDMENT RIGHTS.

In *Bruen*, the Supreme Court "directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Bruen*, 597 U.S. at 17. The *Bruen* Court "explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. [The *Bruen* Court] also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to "justify its regulation." *Id.*, at 24.

Next, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. 597 U. S., at 26-31, [ ]. A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen* at 29, and n.7).

"Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 597 U.S. at 26-27.

"[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that

29

burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citing *McDonald*, 561 U.S., at 767; quoting *Heller*, 554 U.S., at 599).

The Defendants make much of the "disclaimer" section in *Heller*, and the misinterpretation of same is the foundation of the district court's error. *See also Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("holding decides nothing about who may lawfully possess a firearm"). The lower court held such language means that firearm prohibitions are constitutional, including as-applied to Plaintiff.

However, "the impetus of the Founding-era laws [was] a desire to stop firearms from being possessed or carried by those who cannot be trusted with them. But presumptions aren't rules—they can be rebutted. And so it may be that an individual subject to § 922(g)(1) would not, if armed, plausibly pose a threat to the orderly functioning of society." *Range II*, 69 F.4th at 112 (Porter, J., concurring).

The concurrence in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), on which the subsequent *Vincent v. Bondi*, 127 F.4th 1263

(10th Cir. 2025) and *United States v. Warner*, 131 F.4th 1137 (10th Cir.

2025) relied, noted the following:

> [T]he felon dispossession dictum may lack the "longstanding" historical basis that *Heller* ascribes to it. Indeed, the scope of what *Heller* describes as "longstanding prohibitions on the possession of firearms by felons," 128 S. Ct. at 2816-17, is far from clear.
> . . .
>
> [M]ore recent authorities have not found evidence of longstanding dispossession laws. On the contrary, a number have specifically argued such laws did not exist and have questioned the sources relied upon by the earlier authorities. *See, e.g.*, [Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009)] (finding Kates's evidence of longstanding felon dispossession "surprisingly thin"); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 709-10, 714 (2009) (challenging the evidence cited by both Dowlut and Kates). Instead, they assert, the weight of historical evidence suggests felon dispossession laws are creatures of the twentieth--rather than the eighteenth--century. *See, e.g.*, Marshall, *supra*, at 698-713 (comprehensively reviewing the history of state and federal dispossession laws); Larson, *supra*, at 1374 ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); Adam Winkler, *Heller's Catch 22*, 56 UCLA L. Rev. 1551, 1561, 1563

31

(2009) (same). Together these authorities cast doubt on a categorical approach to felon dispossession laws.

*McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring).

Judge Tymkovich went on to say that:

> In what could be described as the [*Heller*] opinion's *deus ex machina* dicta, *Heller* simply declared that nothing in it "cast[s] doubt on longstanding prohibitions on the possession of firearms by felons" or various other gun control laws. 128 S. Ct. at 2816-17. And that was it. These provisions, and the various regulations they encompassed, were supported without any explanation of how they would fare in light of the Second Amendment's original meaning. *See id.* at 2827 (Stevens, J., dissenting); *id.* at 2869-70 (Breyer, J., dissenting).

*McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring).

After reviewing the "eight academic articles and decisions of six other circuits," that the plurality in *Binderup* relied upon to support its virtue-based theory of the Second Amendment, Judge Bibas in dissent in *Folajtar v. AG of the United States*, 980 F.3d 897 (3rd Cir. 2020) found that "[m]ost of the evidence dovetails with dangerousness." *Id.* at 919 (Bibas, J., dissenting).

But Section 922(g)(1) is not triggered by a finding of dangerousness. Unlike some state disarmament provisions, e.g., 18 Pa. Const. Stat. Ann. § 6105(b); N.J. Stat. Ann. § 2C:39-7, it is not even triggered by a conviction for an enumerated crime or type of crime. Rather, Section 922(g)(1) applies on the basis of an offense's potential sentencing range.

To be sure, by and large the legislature's choices as to what acts to criminalize, or what sentences to impose are its prerogative. But that unyielding deference must give way when constitutional rights are at stake. *See id.* "Otherwise, 'the Government could make an end-run around the Second Amendment and undermine the right to keep and bear arms." *Id.* at 921-22 (quoting *Binderup*, 836 F.3d at 350-51 (Ambro, J.)).

One critique authored by a long-time federal district judge noted that district courts routinely sentence white-collar defendants to the absolute minimums, likely because of "the near universal lack of faith in the Sentencing Commission's approach to economic crime sentencing" and "likely because, as with a wide range of critics, federal

judges lack sufficient confidence in the policies underlying it and the
sentencing ranges it produces." Mark W. Bennett, Justin D. Levinson,
& Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An
Empirical Study Revealing the Need for Further Reform*, 102 Iowa L.
Rev. 939, 989 (2017). Plaintiff notes, as the Courts have, that the
potential sentence's upper limit is what prompts 18 U.S.C. § 922(g)(1),
but if the federal district courts[3] feel the potential sentences are overall
too high, perhaps the mere fact an offense has a high-end sentencing
limit overstates the seriousness of the offense. Perhaps, then, the actual
sentence should be given more weight.

This is why, in defining a fundamental right's scope, courts cannot
blindly defer to legislative classifications. Both *Binderup* majority
authors used the phrase "puts the rabbit in the hat" to dismiss the
notion that sentencing classifications, without more, remove individuals

---

[3] "Adding volume to the already existing chorus of dissent are the results of
our original empirical study of 100 federal district court judges, and 240 judges
overall, which showed remarkable minimum sentencing agreement among an
extremely diverse group of judges. The study also showed that the desire for these
minimum sentences largely overpowered judges' differences in sentencing
philosophies such as retribution." Bennett, *Federal White-Collar Fraud Sentencing*
at 989.

34

from the right's scope. *Binderup*, 836 F.3d at 350 (Ambro, J.); *id.* at 365 n.11 (Hardiman, J., concurring).

> Why not minor infractions? Could Congress find someone once cited for disorderly conduct to be "not law-abiding" and therefore to have forfeited his core Second Amendment right? . . . . Why should we not accept every congressional determination for who is or is not "law-abiding" and "responsible" for Second Amendment purposes?

*United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring).

"Why not? Because *Heller* was a constitutional decision. It recognized the scope of a passage of the Constitution. The boundaries of this right are defined by the Constitution. They are not defined by Congress." *Id.* "When the Second Amendment applies, its core guarantee cannot be withdrawn by the legislature or balanced away by the courts." *Binderup*, 836 F.3d at 365 (Hardiman, J., concurring) (footnote omitted).

The *Binderup* three-judge opinion also recognized that Courts must not 'defer blindly' to maximum possible punishments," *Binderup*, 856 F.3d at 350-51 (Ambro, J.), and that it is "important" to look at the

35

sentence imposed on a specific defendant. *Id.* at 352 (Ambro, J.). That is a truer sign of whether a particular crime is "serious" or 'minor.' *Id. See also Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting).

"[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." *Id.* at 708.

In *Kanter,* the Court, and Judge Barrett in dissent, made in-depth and important observations regarding the historical record that bears upon this case. Therein, the Court noted:

> The first question is whether nonviolent felons as a class historically enjoyed Second Amendment rights. *Heller* did not answer this question. True, "some of *Heller*'s language does link Second Amendment rights with the notion[] of 'law-abiding citizens.'" *Meza-Rodriguez*, 798 F.3d at 669; *see also Heller*, 554 U.S. at 634-35 (observing that the "core" of the Second Amendment right is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (emphasis added)) ... However, the Court never actually addressed the historical pedigree of felon dispossession laws.

*Kanter*, 919 F.3d at 445 (boldface added).

36

The *Kanter* Court then held: "If the founders were really just concerned about dangerousness, not a lack of virtue, non-violent felons like Kanter arguably fall within the scope of the Second Amendment's protections." *Kanter*, 919 F.3d at 447.

As we now know from *Rahimi*, 602 U.S. at 695-97, the founders were extremely concerned about dangerousness, and dangerous and threatening persons were the ones as to whom they sought to limit firearm access.

Further:

> Most felonies today are far removed from those capital crimes at common law. We often see little rhyme or reason in which crimes are labeled felonies. For instance, a radio talk show host can become a felon for uttering "any obscene, indecent, or profane language by means of radio communication." 18 U.S.C. § 1464. In New Jersey, opening a bottle of ketchup at the supermarket and putting it back on the shelf is a third-degree felony, punishable by up to five years' imprisonment. *See* Paul H. Robinson *et al., Report on Offense Grading in New Jersey* 3 (2011) (citing N.J. Stat. Ann. §§ 2C:40-17(a), 2C:43-6.a(3) (West 2010)).

*Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting); *see also see also United States v. Duarte*, 137 F.4th 743, 791 (9th Cir. 2025) (*en banc*)

(VanDyke, J., dissenting); Isee also Paul H. Robinson *et al.*, *The Modern Irrationalities of American Criminal Codes: An Empirical Study of Offense Grading*, 100 J. Crim. L. & Criminology 709, 719 & nn.44, 46 (2010); *see also* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 523-33, 536-37 (2001) ("The [felony] category is elastic, unbounded, and manipulable by legislatures and prosecutors).

Therefore, "as a predictor of an individual's violent tendencies or his risk to the public, the felon label is patently overinclusive. Indeed, the term "felony" is regularly applied to a wide array of nonviolent conduct. *See* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1363 (2008) (describing as "absurd" the "claim that income tax evasion, antitrust law violations, or . . . calling George W. Bush a jackass should disqualify anyone from owning a firearm").

"And as the list of felonies in state and federal criminal codes continues to grow, the range of nonviolent conduct that can potentially disqualify the average citizen from ever possessing a firearm under §

922(g)(1) has expanded in equal measure." Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban In a Post-Heller World*, 70 Duke L.J. 1429, 1451-52 (2021) (citing *see Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting) ("With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone."); *cf.* Gary Fields & John R. Emshwiller, *Many Failed Efforts To Count Nation's Federal Criminal Laws*, WALL ST. J. (July 23, 2011), https://www.wsj.com/articles/SB100014240527023043198045763896010 79728920 [https://perma.cc/C6TQ-L9H5]). "It simply challenges common sense to suggest that the public is equally threatened by an armed ex-felon with a history of violent behavior as it is by someone whose criminal record is limited to falsifying income on a mortgage application." Sherwood, *Time to Reload*, 1452 (citing *Medina*, 913 F.3d at 154.

What is also evident is that Section 922(g)(1) actually applies on the basis of an offense's potential sentencing range. But "[a] crime's

maximum possible punishment is 'purely a matter of legislative prerogative,'" *Binderup*, 836 F.3d at 351 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274 (1980)), "subject only to 'constitutional prohibitions on irrational laws,'" *id.* (quoting *Heller*, 554 U.S. at 628, n.27) (other citation omitted).

"Further, one cannot even claim the statute is supposed to be about only allowing "responsible" persons, given that "§ 922(g)(1) is blatantly underinclusive on this front by its own terms. Although § 922(g)(1) applies to anyone who has been convicted of a crime 'punishable by imprisonment for a term exceeding one year,' any previous convictions 'pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices' are specifically excluded from the statute's ambit. As other scholars acknowledge, there is no principled explanation for this 'business practices' exception.[4] Arguing that perpetrators of these serious offenses are somehow more 'law abiding' or

---

[4] *See, e.g.*, Sanford Levinson, *Comment on Ruben and Blocher: Too Damn Many Cases, and an Absent Supreme Court*, 68 DUKE L.J. ONLINE 17, 28 (2018) ("Is lying to the F.B.I. about insider trading [like Martha Stewart] really more of a threat to the republic than the 'business practices' exempted from coverage by § 921(a)(20)(A)?").

'responsible' than other convicted felons borders on the frivolous. And if one instead rationalizes the business practices exception as 'reduc[ing] unnecessary restrictions' on gun ownership for certain white-collar felons who do not exhibit 'dangerous tendencies,' one must wonder what makes those convicted of nonviolent crimes unrelated to business practices more dangerous." Sherwood, *Time to Reload*, 1450-51 (citing *United States v. Coleman*, 609 F.3d 699, 706 (5th Cir. 2010) (prior conviction for conspiracy to infringe a copyright does not fall within the business practices exception); *United States v. Stanko*, 491 F.3d 408, 419 (8th Cir. 2007) (prior conviction for violating the Federal Meat Inspection Act likewise falls outside the exception)).

As Section 922(g)(1) does not even extend to all felons, one must ask why certain non-violent felons remains unscathed under § 922(g)(1), while other non-violent felons, such as Plaintiff, get a lifetime ban.

This is exactly why the "felony" label as justification for a permanent categorical Second Amendment ban was rejected by the *Range II* Court:

> At root, the Government's claim that "felons are not among 'the people' protected by the Second Amendment," *see* Gov't *Range II En Banc* Br. 9 n.1, devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label."

*Range II*, 124 F.4th at 228 (quoting *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting)).

One crucial point - by all accounts the defendant in *Rahimi* was a violent criminal, threatening his ex-girlfriend, his child, and multiple strangers under numerous different circumstances, mostly with a firearm. *Rahimi*, 602 U.S. at 686. He pleaded guilty to possessing a firearm despite a domestic violence restraining order (the conviction he was challenging). *Id.* at 1896. He was violent and dangerous, and a threat to others. *Id.* at 1902. And in conducting the history and tradition analysis required by *Bruen*, the Court acknowledged that the defendant and others like him were of "the people" covered by the Second Amendment. *See id.* at 1907 (Gorsuch, J., concurring) ("In this case, no one questions that the law Mr. Rahimi challenges addresses

42

individual conduct covered by the text of the Second Amendment.") And if someone like the defendant in *Rahimi* is one of "the people" under the Second Amendment, then surely Plaintiff qualifies as well.[5] *See United States v. Prince*, 700 F. Supp. 3d 663, 668 (N.D. Ill. 2023); *app. filed*.

This is why, outside a vacuum, Justices Alito's and Kavanaugh's concurring references in *Bruen* to the "exceptions" language in *Heller* do not carry as much weight as has been contended. Felony disarmament is not actually long-standing (violent felonies since 1938; all felonies only since 1961), and the intended focus on "dangerousness," which was the concern in the founding-era, limits the scope of such an exception.

There is simply no historical basis for disarming non-dangerous persons. Then-Judge Barrett noted it in *Kanter*, when she discussed that felons were not categorically disarmed by founding era legislatures. *See Kanter*, 919 F.3d at 451, 454 (Barrett, J., dissenting). Rather, those who were disarmed in the founding-era were loyalists to the British Crown, because they were potentially dangerous to the United States.

---

[5] *See also Phillips*, 2023 U.S. Dist. LEXIS 230181, *16 (there is "no reason to think that the word "people" does not cover, on its face, all persons—including a person convicted of a felony.") As *Phillips* involved a violent felon, its relevance ends there.

43

*See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); *see also e.g.,*
*Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

"History is consistent with common sense: it demonstrates that
legislatures have the power to prohibit dangerous people from
possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).
"[T]hat power extends only to people who are dangerous. Founding-era
legislatures did not strip felons of the right to bear arms simply because
of their status as felons." *Id.*

We know this because "'[t]he best historical support for a
legislative power to permanently dispossess all felons would be
founding-era laws explicitly imposing—or explicitly authorizing the
legislature to impose—such a ban,' but scholars and judges thus far
'have not been able to identify any such laws.'" *Kanter*, 919 F.3d at 454
(Barrett, J., dissenting). *See also* Joseph G.S. Greenlee, *The Historical*
*Justification for Prohibiting Dangerous Persons from Possessing Arms*,
20 WYO. L. REV. 249, 275–83 (2020).

The district court gave much weight to the *Atkinson* dissent, but
notably, the dissent in *Atkinson* did not find such a law, either, noting;

44

"Around the time of the American Revolution through the drafting and adoption of the Constitution and the Bill of Rights, gun regulations covered three principal topics: (1) storage, (2) militias, and (3) loyalty." *Atkinson v. Garland*, 70 F.4th 1018, 1033 (7th Cir. 2023) (Wood, J., dissenting). The dissent further noted that ""[t]he preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties." *Id.* at 1035 (Wood, J., dissenting) (citing *Hill v. State*, 53 Ga. 472, 477 (1874)).

The *Atkinson* dissent listed three categories of laws, the violation of which would historically result in total disarmament: those that did not comply with "loyalty oath laws previously discussed, and in the laws that disarmed persons found guilty of treason and members of native tribes." *Atkinson*, 70 F.4th at 1035 (Wood. J., dissenting). And while the Framers found each of these categories of persons – for different reasons – to be "dangerous to the political community," *id*, of course none of those apply to Plaintiff.

45

The district court therefore committed reversible error in dismissing Plaintiff's Amended Complaint due to the purported constitutionality of 18 U.S.C. § 922(g)(1) in reliance on the *Atkinson* dissent's analysis.

In *Rahimi*, the Court noted that "English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. **By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic.**" *Rahimi*, 602 U.S. at 694 (citing *Heller*, 554 U.S. at 594-595) (boldface added). In other words, the *Atkinson* dissent's examples were not a relevant part of the American historical record at the time of the Founding.

Even those people mentioned by the *Atkinson* dissent could get their rights back. People in England and the colonies (pre- and during the Revolutionary War) who didn't take the required loyalty oaths could change their minds and swear the oath, and they had their firearm rights restored. *Range II*, 69 F.4th at 122-125 (Krause, dissenting).

46

Native Americans were likewise allowed to possess firearms, though Americans were forbidden to *sell* to them. *See e.g.*, *Laws and Ordinances of New Netherland*, 1638-1674, at 18-19 (1868) (1639 New Netherland law); *Records Of The Colony Of New Plymouth, in New England*, at 243 (1856) (1675 Plymouth law); *See also Prince*, 700 F. Supp. 3d at 671.

In any event, discriminatory laws regarding various races and religions, all abrogated by subsequent laws and constitutional amendments, in addition to being odious, are of no historical value, because they were specifically repudiated as precedents by the subsequent legislation. While the Court in *Zherka v. Bondi*, 140 F.4th 68, 89-90 (2d Cir. 2025) apparently found them sufficient, this Court should reject such a conclusion.

As to felons, "[i]ndividuals who committed less serious crimes also lost their firearms on a temporary, if not permanent, basis. Where state legislatures stipulated that certain offenses were not punishable by death or life imprisonment, but rather resulted in forfeiture, the offender was stripped of his then-existing estate, including any

47

firearms, and only upon successfully serving of his sentence and reintegrating into society could he presumably repurchase arms.

Finally, colonial and state legislatures punished minor infractions with partial disarmaments by seizing firearms involved in those offenses." *Range II*, 69 F.4th at 127-128 (Krause, dissenting). Thus, such non-violent felons were not permanently disarmed, even if the offending firearms were forfeited. *See* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16:1 Drexel L. Rev. 70-71 (2023). The Court in *United States v. Hunt*, 123 F.4th 697, 706 (4th Cir. 2024), *e.g.*, apparently equated seizure of a firearm with permanent disarmament, but that is an incorrect conclusion.

Therefore, "[b]ecause the historical analogues fail to match either the 'how' or the 'why' of *Bruen*'s test, they are not 'relevantly similar' to § 922(g)(1)." *Duarte*, 137 F.4th at 793 (VanDyke, J., dissenting) (quoting *Rahimi*, 602 U.S. at 692).

The Framers did not have felon disarmament laws, but they were nonetheless familiar with disarming "risky people" to "suppress armed violence." *See* Marshall, *Why Can't Martha Stewart*, 698.

In common law, "Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that 'no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People.' 1 *Pleas of the Crown* 136." *Bruen*, 597 U.S. at 45. There is likewise no reason that Plaintiff, or someone in his shoes that committed a non-violent crime, would "terrify" the public by being trusted with Second Amendment rights. *See Kanter*, 919 F.3d at 456 (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686) ("English common law 'punish[ed] people who [went] armed to terrify the King's subjects' with imprisonment and forfeiture of their 'armour,'")). Parliament also disarmed Catholics for fear of threats or terror. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); *see also* Marshall, *Why Can't Martha Stewart*, 723.

In the American colonies, the policies of disarmament were focused on those whose loyalty were questioned, as the colonies were

concerned about "social upheavals" and "rebellion." Robert H. Churchill,

*Gun Regulation, the Police Power, and the Right to Keep Arms in Early*

*America: The Legal Context of the Second Amendment*, 25 LAW &

HIST. REV. 139, 157 (2007)). "After all, confiscation of guns from those

who refused to swear an oath of allegiance was meant to deal with the

potential threat coming from armed citizens who remained loyal to

another sovereign." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting)

(quotation marks omitted). Massachusetts, Pennsylvania, and

Connecticut, for example, disarmed loyalists to the Crown and those

who refused to swear allegiance to the state or United States because

they were potentially dangerous. *See*, *e.g.*, *Folajtar*, 980 F.3d at 914

(Bibas, J., dissenting); see also G.A. Gilbert, *The Connecticut Loyalists*,

4 AM. HIST. REV. 273, 281–82 (1899)).

Looking to the adoption of the Constitution itself, the closest

proposals to a complete felon disarmament ban that existed were from

the New Hampshire, Pennsylvania, and Massachusetts ratifying

conventions. But those were all focused on dangerousness, as "[t]he

concern common to all three is not about felons in particular or even

50

criminals in general; it is about threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

New Hampshire recommended that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) (emphasis added). Massachusetts had a proposal that the Constitution "be never construed to authorize Congress to . . . prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 675, 681 (1971) (emphasis added).

This, of course, raises the question of what the term "peaceable" meant to the Framers, but the term then was associated with dangerousness as well. See 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773) (defining "peaceable" as "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent"). And to the extent that "peaceability" was connected to criminal conduct, a "breach of the

peace" was connected directly to danger and violence. *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 327 & n.2 (2001) (noting some "variations in the common-law usage of the term 'breach of the peace' " but assuming the definition "entail[ed] at least a threat of violence"); Michael Dalton, *The Country Justice* 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used in *terrorem*.").

The *Atikinson* dissent, and thus the lower court, cited to the *Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents*, but the Pennsylvania Minority suggested adding language to the Constitution specifying that "no law shall be passed for disarming the people or any of them unless for crimes committed, or **real danger of public injury** from individuals . . . ." Schwartz, *The Bill of Rights: A Documentary History*, 665 (emphasis added). While Defendants wish this Court to read this proposal broadly to include "those who have committed any crime—felony or

52

misdemeanor, violent or nonviolent," as well as "those who have not committed a crime but nonetheless pose a danger to public safety," such a reading is implausible given that no one—either at the Founding or today—reads the language of "crimes committed" in the proposal "to support the disarmament of literally all criminals, even nonviolent misdemeanants." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). Further, the Pennsylvania Minority did not even convince its own convention, much less the rest of the states.

Even if construed extraordinarily broadly, it cannot be construed as probative of the actual meaning of the Second Amendment, especially since the *Bruen* Court specifically rejected basing dispositive interpretations on one state's actions. *See Bruen*, 597 U.S. at 65 ("As in *Heller*, we will not "stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense"). Also, the *Heller* Court concluded that it was "dubious" to rely on "the various proposals in the state conventions" to

53

interpret the Second Amendment, which codified "a pre-existing right." 554 U.S. at 603.

Indeed, both Blackstone and Webster demonstrate that the word "crime" at the Founding could be understood to refer not to all crimes but rather to those "of a deeper and more atrocious" kind. 4 Blackstone, *Commentaries* 180 (1769); Crime, *Webster's Dictionary* (1828).

Blackstone recognized that not every offense was capital. "[t] the general nature of the punishment, *viz.* by fine or imprisonment, is in these cases fixed and determinate: though the duration and quantity of each must frequently vary, from the aggravations or otherwise of the offense, the quality and condition of the parties, and from innumerable other circumstances." Blackstone, 4 *Commentaries* 222.

"And even for those crimes that were capital, '[t]he colonies carried out the death penalty 'pretty sparingly,' and '[p]roperty crimes were, on the whole, not capital.' ' [*Folajtar v. AG of the United States*, 980 F.3d 897, 920 (3d Cir. 2020) (Bibas, J., dissenting)] (quoting Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993)). *United States v. Duarte*, 137 F.4th 743, 788 (9th Cir. 2025)

(VanDyke, J., dissenting). At the founding, "many states were moving away from making felonies ... punishable by death in America." *Duarte*, 137 F.4th at 788 (VanDyke, J., dissenting) (quoting *Range v. AG United States*, 124 F.4th 218, 227 (3rd.Cir. 2024) (*Range II*)).

As Judge VanDyke noted in his *Duarte* dissent: "Absent the relationship at the founding between the historical punishments for felonies and § 922(g)(1), the majority's rationale crumbles." *Duarte*, 137 F.4th at 789 (VanDyke, J., dissenting). "The Founding-era practice of punishing some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue here—*de facto* lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition." *Id.* (quoting *Range II*, 124 F.4th at 231).

In *Kanter*, then-Judge Barrett also explained why the concept of "civil death," where the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries, did not apply to the Second Amendment analysis, as "for felons sentenced to less than life, the courts understood their

55

rights as 'merely suspended during the term of the sentence.'" *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting)); *see also Prince*, 700 F. Supp. 3d at 675.

Additionally, the argument that death must include the stripping of the right to bear arms in the English common law failed in *Range II*. There, the Court stated:

> That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. Krause Dissent at 28-29. That aptly describes Range's situation. So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing for execution and forfeiture.

*Range II*, 69 F.4th at 105. *See also Prince*, 700 F. Supp. 3d at 674; *see also Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-

56

era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.").

"Founding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally. *See, e.g.*, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343-344 ("An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns"); Act of Apr. 20, 1745, ch. 3, N.C. Laws 69-70 ("An Act to prevent killing deer at unseasonable times, and for putting a stop to many abuses committed by white persons, under pretence of hunting")." *Range II*, 69 F.4th at 105.

Additionally, felons were sometimes expressly allowed to maintain their arms. For example, in 1786 Massachusetts, if the tax collector stole the money he collected, the sheriff could sell the collector's estate in order to recover those monies. If the sheriff then stole the money from the collector's estate sale, the sheriff's estate could be sold to recover the amount he stole. And if an estate sale did not cover the stolen amount, the deficient collector or sheriff would be imprisoned.

However, in said estate sales, certain items deemed necessary, including firearms, could not be sold. *See* 1786 Mass. Laws 265.

"[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." *Id.* at 708. It was only in 1938 that Congress, for the first time, restricted anyone's access to firearms: prohibiting persons convicted of a "crime of violence" from shipping or receiving firearms in interstate commerce. Federal Firearms Act, Pub. L. No. 75-785, § 2(e), (f), 52 Stat. 1250, 1251 (1938) ("FFA").[6]

In enacting the FFA, "Congress sought . . . to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572 (1977) (internal citations and quotation marks omitted).

---

[6] The FFA defined "crime of violence" to include only "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." FFA § 1(6), 52 Stat. at 1250. See also *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011), cert. den., 132 S. Ct. 1538 (2012).

In 1961, Congress enlarged this prohibition to include nonviolent criminals by replacing the "crime of violence" element with "crime punishable by imprisonment for a term exceeding one year." An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757, 757 (1961). In 1968, Congress again expanded the prohibition by replacing the "receipt" element of the 1938 law to "possession," giving 18 U.S.C. § 922(g)(1) its current form. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. VII, § 1202, 82 Stat. 197, 236. Despite this expansion, the Courts have recognized that the point of 18 U.S.C. § 922(g)(1) was to keep firearms out of the hands of risky, threatening, and dangerous people. *See, e.g., Scarborough, supra.* Plaintiff as an individual simply does not fall into that category.

Therefore, when comparing Plaintiff to the historical categories of persons cited by the *Atkinson* and *Kanter* dissents, the *Bruen* "why" is completely different, and in the case of those violating loyalty oaths who could get their rights restored, the "how" is different as well.

"Even if the 1938 Act were 'longstanding' enough to warrant *Heller*'s assurance—a dubious proposition given the *Bruen* Court's

emphasis on Founding- and Reconstruction-era sources, 142 S. Ct. at 2136, 2150— Range would not have been a prohibited person under that law. Whatever timeframe the Supreme Court might establish in a future case, we are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right. So the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden." *Range II*, 69 F.4th at 104. So too is it with Plaintiff in this case.

In comparing the "how" and the "why," Section 922(g)(1) does not hold up; in addition to serving as a prohibitor on the violent and dangerous, it also lumps in those who are not violent. The Defendants argue about "responsible" persons, but the Supreme Court rejected that argument in *Rahimi*.

In *Range*, the majority concluded: "Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot

60

constitutionally strip him of his Second Amendment rights." *Range*, 69 F.4th at 106. Plaintiff seeks the same as-applied relief.

The district court cited to subsequent cases, but none of them support affirmance.

## VI.   THE SUPREME COURT'S *RAHIMI* DECISION MAKES CLEAR THE PROPER FOCUS IS ON DANGEROUSNESS.

There is, simply put, nothing about the Supreme Court's *Rahimi* decision that supports the district court's ruling in this case.

"Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 602 U.S. at 690.

"[The Supreme] Court reviewed the history of American gun laws extensively in *Heller* and *Bruen*. From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693.

As noted above, while by the time of the founding governmental authority to disarm political opponents had been eliminated due to the Second Amendment and state constitutions, *see Heller*, 554 U.S. at 594-

595, 600-603, "regulations targeting individuals who physically

threatened others persisted." *Rahimi*, 602 U.S. at 694.

*Rahimi* then discussed the two legal remedies to threats of firearm

violence. The first was the surety – where:

> the law authorized magistrates to require individuals
> suspected of future misbehavior to post a bond. *Ibid*. If
> an individual failed to post a bond, he would be jailed.
> *See, e.g.*, Mass. Rev. Stat., ch. 134, §6 (1836). If the
> individual did post a bond and then broke the peace,
> the bond would be forfeit. 4 Blackstone 253.

*Rahimi* at 695. "Importantly for this case, the surety laws also

targeted the misuse of firearms." *Id.* at 696.

The second method of using regulations to impact firearm violence

were the "going-armed" laws. *Id.* at 697. "Whether classified as an

affray law or a distinct prohibition, the going armed laws prohibited

'riding or going armed, with dangerous or unusual weapons, [to] terrify[

] the good people of the land.' 4 Blackstone 149 (emphasis deleted). Such

conduct disrupted the 'public order' and 'le[d] almost necessarily to

actual violence.' *State v. Huntly*, 25 N. C. 418, 421-422 (1843) (*per

curiam*). Therefore, the law punished these acts with 'forfeiture of the

62

arms . . . and imprisonment.' 4 Blackstone 149." *Rahimi*, 602 U.S. at 697.

The *Rahimi* Court's ultimate holding thus dovetails exactly with then-Judge Barrett's dissent in *Kanter*. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 602 U.S. at 698.

"[O]ur Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others **from those who have not**." *Rahimi*, 602 U.S. at 700 (boldface added).

*Rahimi* thus instructs that Plaintiff's claim cannot be denied unless he is "dangerous." *Rahimi* and its focus on "dangerousness" as the touchstone for disarmament affects every holding relied upon by Defendants to try and argue that Plaintiff, as a non-violent felon, supposedly deserves to be permanently disarmed under 18 U.S.C. § 922(g)(1). In fact, *Rahimi* pushes inexorably towards the opposite conclusion.

63

## VII. PLAINTIFF'S AS-APPLIED CHALLENGE SHOULD SUCCEED BECAUSE HE CAN DEMONSTRATE THAT – DESPITE HIS CONVICTION - HE IS A NON-DANGEROUS PERSON.

The district court also concluded that, even if as-applied challenges are allowed, those convicted of fraud and non-violent felons, presumably categorically, are too dangerous to allow to actually succeed in such a challenge. That argument is logically fallacious, and turns the *Atkinson* Court's holding about as-applied challenges on its head. The district court seems to have sidestepped this Court's instructions and ruled to prevent any as-applied challenges, but that is not allowed.

The *Gay* Court – which ruled before *Rahimi* - did not follow the holding or instructions set forth in *Atkinson*, perhaps because the defendant in *Gay* was so obviously a person unqualified for receiving relief regarding Section 922(g)(1). For whatever reason this was done, however, the effect was to skirt the *Atkinson* ruling.

18 U.S.C. § 922(g)(1), in its current form, was is an innovation of the second half of the 20th century that was designed to be a "sweeping prophylaxis . . . against misuse of firearms." *Lewis v. United States*, 445 U.S. 55, 63 (1980); *see also Scarborough*, 431 U.S. at 572 ("Congress

sought to rule broadly to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation marks omitted)).

Such a sweeping permanent measure departs from our historical traditions, and most recent Courts to comment on the issue have seemed to acknowledge that there is nothing in Supreme Court precedent that forecloses individual as-applied challenges in order to vindicate one's rights. *See, e.g., United States v. Griffin*, 704 F. Supp. 3d 851, 862-63 (N.D. Ill. 2023) (on appeal). Otherwise, the Second Amendment would be improperly relegated to second class status.

Plaintiff regrets his role in the scheme for which he was convicted. However, Plaintiff was convicted not of taking the $12,000.00 commission – for he was arguably entitled to a commission as a corporate recruiter for placing a client in a position – but for *sharing* $6,000.00 of it with the con man who fraudulently placed the candidate with his own company and then took half of the commission for doing so. Ironically, if Plaintiff had kept the entire $12,000.00, as an outside recruiter he would have done nothing wrong. This happened one time,

65

and once he realized that something was suspicious about the situation, he refused any further participation. Of course, the authorities were already investigating, and Plaintiff did plead guilty as a voluntary act. But he was not the ringleader, and his unwitting participation was not evidence of a "thought-out crime," at least on Plaintiff's part. *See Hatfield*, 925 F.3d at 951.

Plaintiff accepted responsibility for his actions, and has spent the last twenty-eight years moving past them. He is willing to supply whatever information the Court requires to prove himself. Plaintiff knows there are plenty of people whose worst moments would make such a request pointless. But per *Heller*'s use of "presumptively lawful," *someone* has to qualify, and all Plaintiff seeks is a chance to show the Court that it is him.

Plaintiff refrains from possessing a firearm for self-defense and other lawful purposes because doing so is illegal pursuant to 18 U.S.C. § 922(g)(1), and 430 ILCS 65/14(c)(3). This alone places Plaintiff in a different position that the litigants in most of the cases involving 18 U.S.C. § 922(g)(1) such as the defendant in *Gay* or *Williams*, who were

66

felons arrested for possessing a firearm while a felon, thus largely removing any argument that they were law-abiding persons. Furthermore, as Plaintiff has no history of violence, Defendant's objective is not advanced by prohibiting Plaintiff from possessing arms in his home for self-defense.

There is nothing in Plaintiff's conviction that would have counted as violent or threatening to anyone, nor in his conduct that would have made him subject to either a "going armed" affray-type law, or a surety. Plaintiff has shown herein how there are thousands of felonies – many of them which do not involve violence – which are so because of the potential sentence, as opposed to the criminal conduct itself. *Sir John Knight's Case*, 87 Eng. Rep. at 76, showed it was not just the conduct (riding armed) but the facts of the case and the intent they revealed (for purpose to "terrify"). This is why Sir John Knight committed the act but was acquitted for not having the requisite *mens rea.* This case teaches that elements of the crime must be considered.

In short, history suggests – and the Supreme Court appears to agree – that the infliction - or threat of infliction – of harm puts one in the dangerous or violent category.

After 28 years of a productive and law-abiding life since the conviction, with no evidence of Plaintiff ever committing violence, it was error for the district court to characterize him as "by no means, a 'law-abiding, responsible citizen,'" *Gay,* 98 F.4th at 843, and write that the record "undermines his claim," when there has been no record. *See* David Weisburd and Ellen Chayet, *White Collar Crime and Criminal Careers: A Final Report Submitted to the National Institute of Justice*, 41-42 (1993). Further, as Plaintiff is "tell[ing] the truth and seek[ing] judicial relief," he is complying with the dictates of *United States v. Holden*, 70 F.4th 1015, 1017-1018 (7th Cir. 2023). Plaintiff should not be compared with the criminal defendant in *Gay*, who asserted his rights only after being arrested for being a felon with a gun, nor with the repeat offenders in the criminal cases the district court and Defendants cited below.

Atkinson acknowledges that the Seventh Circuit in *Kanter* and *Hatfield* took a dim view of persons who plead guilty to fraud, even if it was 28 years ago. But since non-dangerous persons, including felons, were not historically permanently disarmed in the founding era, then such persons should not be disarmed now, and at the least should have the opportunity now to show they are not dangerous.

CONCLUSION

In light of the above, the District Court's F.R. Civ. P. 12(b)(6) dismissal of Plaintiff's Amended Complaint should be reversed and remanded with instructions that judgment be entered in Plaintiff's favor or, in the alternative, that Defendants file an Answer to Plaintiff's pending Amended Complaint and that Plaintiff's Second Amendment claim should proceed to the discovery process, as well as any and all relief consistent with such ruling.

Respectfully submitted,

Dated: May 2, 2026                    By: _____/s/ David G. Sigale_____
                                              David G. Sigale

                                              Attorney for Plaintiff-Appellant
                                              Patrick Atkinson

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

70

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,035 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2016 in 14 point Century font.

    /s/ David G. Sigale    
David G. Sigale

Attorney for Plaintiff-Appellant

Dated: May 2, 2026

☑

# CERTIFICATE OF SERVICE
## Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___May 2, 2026___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___David G. Sigale___

☐

# CERTIFICATE OF SERVICE
## Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                   address:

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

s/ _____

REQUIRED SHORT APPENDIX

TABLE OF CONTENTS

CIRCUIT RULE 30(d) STATEMENT ................................................. i

DISTRICT COURT JUDGMENT ................................................ SA 1

DISTRICT COURT OPINION ..................................................... SA 2

AMENDED COMPLAINT ....................................................... SA 17

NOTICE OF APPEAL (DATED 2/12/26) .....................................SA 32

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) are included in the required short appendix. All materials required by Circuit Rule 30(b) are also included in the short appendix pursuant to Circuit Rule 30(b)(7).


/s/ David G. Sigale
David G. Sigale

i

ILND 450 (Rev. 04/29/2016) - Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Patrick Atkinson

Plaintiff(s),

v.

Merrick B. Garland, et al.

Defendant(s).

Case No. 1:21-cv-291
Judge John Robert Blakey

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $

       which ☐ includes     pre–judgment interest.
                 ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☑     other: Court finds that his facial and as-applied challenges to § 922(g)(1) fail as a matter of law.

---

This action was *(check one)*:

☐ tried by a jury with Judge                 presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☑ decided by Judge Blakey         on a motion to dismiss

Date: 2/9/2026             Thomas G. Bruton, Clerk of Court

Emily Wirtz , Deputy Clerk

SA 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 291 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| PAMELA BONDI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Patrick Atkinson, a convicted felon, sues the Attorney General of the United States and the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, challenging the constitutionality of 18 U.S.C. § 922(g)(1), both facially and as applied to him. *See* [26]. Defendants move to dismiss, [40], and, for the reasons explained below, the Court grants the motion.

## I.    Factual Background & Procedural History

On October 16, 1998, Plaintiff Patrick Atkinson pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, a Class C felony, punishable by a sentence of up to twenty years. [26] at ¶ 7; 18 U.S.C. § 1341. Judge Leinenweber sentenced Atkinson to two years of probation, with six months of home confinement, and ordered him to pay a $15,000.00 fine and perform 200 hours of community service. [26] at ¶ 14; *United States v. Zerba, et al.*, 1:98-cr-00730, [27] (N.D. Ill. Feb. 24, 1999). He completed all his sentencing terms, and, on March 7, 2000, Judge Leinenweber granted his request for early termination of probation, without objection. [26] at ¶ 14,

SA 2

*United States v. Zerba, et al.*, 1:98-cr-00730 [37] (N.D. Ill. Feb. 24, 1999). Since completing his sentence, Atkinson has never been charged with, or convicted of, any other offense that would implicate § 922(g)(1). [26] at ¶ 15.

Atkinson initially sued on January 18, 2021, asserting a single claim challenging the constitutionality of § 922(g)(1) as applied to him, *see* [1]. Defendants moved to dismiss, arguing that his claim remained foreclosed under binding precedent, *see* [6], and the Court agreed, *see* [13], [14]. The Court thus granted Defendants' motion, dismissed the claim and the case with prejudice (because amendment would have been futile in light of that binding precedent), and entered judgment on March 15, 2022. *See* [13], [14], [15]. Atkinson filed his notice of appeal on April 5, 2022, [16].

Two months later, on June 23, 2022, the United States Supreme Court decided *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), which "announced a new framework for analyzing restrictions on the possession of firearms." *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023). As a result, because the parties' briefs on appeal "only scratched the surface of the historical analysis now required by *Bruen*," the panel remanded the matter to allow this Court "to undertake the *Bruen* analysis in the first instance." *Id.* at 1020 (cleaned up).

On remand, Atkinson amended his complaint to make both a facial challenge and an as-applied challenge to § 922(g)(1). *See* [26]. Plaintiff alleges that the prohibition on convicted felons possessing firearms for self-defense, as imposed by § 922(g)(1), is not consistent with the Nation's historical tradition of firearm regulation,

and that enforcement of § 922(g)(1) constitutes an infringement upon his right to keep and bear arms under the Second Amendment, [26] ¶¶ 34–41. He also claims that § 922(g)(1) remains unconstitutional as applied to him, *id.* ¶¶ 44–46. Defendants again move to dismiss, *see* [40], arguing that his claims fail as a matter of law, [40-1]. Analyzing Atkinson's claims utilizing the new framework announced in *Bruen*, the Court now grants Defendants' renewed motion and dismisses Atkinson's claims.

## II.    Applicable Legal Standards

To survive a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the complaint must include sufficient factual allegations to show a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, *id.*, the facts in the complaint must present a claim that rises "above the speculative level." *Id.* at 545. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" cannot by themselves satisfy Rule 8's requirement that the complaint show the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering whether the complaint demonstrates a plausible right to relief, the Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In contrast, "legal conclusions and conclusory allegations" are not entitled to this "presumption of truth" and should not be considered when deciding on a motion to dismiss. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th

SA 4

Cir. 2011).  If the Court finds, after eliminating any legal conclusions and considering only the plaintiff's factual allegations, that the complaint does not show a plausible right to relief, then the moving party's motion to dismiss should be granted.  *Iqbal*, 556 U.S. at 679.

### III.    Discussion & Analysis

#### A.    The Second Amendment and the Impact of *Bruen*

The Second Amendment provides that, a "well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  Section 922(g)(1) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Courts, including the Supreme Court, have long upheld statutory restrictions, like 18 U.S.C. § 922(g)(1), on the possession of firearms by convicted felons.  Plaintiff, like many convicted felons recently, argues that *Bruen* made such restrictions unconstitutional.  *See* [52].

Nevertheless, both the Supreme Court and the Seventh Circuit have held that *Bruen* does not disturb the Supreme Court's prior decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), affirming longstanding prohibitions on the possession of firearms by felons.  *See United States v. Rahimi*, 602 U.S. 680, 699 (2024); *United States v. Gay*, 98 F.4th 832, 846 (7th Cir.

SA 5

2024).  Indeed, in deciding *Bruen*, several justices explicitly affirmed this limitation.  *See Bruen,* 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.  Nor does it decide anything about the kinds of weapons that people may possess.  Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 80–81 (Kavanaugh, J., joined by the Chief Justice, concurring) (endorsing statement in *Heller* about the propriety of "longstanding prohibitions on the possession of firearms by felons"); *see also id.* at 129 (Breyer, J., joined by Sotomayor J. and Kagan, J., dissenting) (agreeing with Justice Kavanaugh that Court's decision in *Bruen* casts "no doubt" on *Heller*'s prohibition of firearms possession by felons).

Moreover, the Court in *Bruen* did not mention § 922(g)(1) (or any other criminal statute), let alone invalidate it.  Rather, *Bruen* considered only the applicable framework for assessing challenges to firearm regulations under the Second Amendment, rejecting the "two-part approach" that had been developed by some federal courts of appeals in evaluating such challenges in favor of one that "centers on the constitutional text and history."  597 U.S. at 19–25.  Even under the historical text approach set out in *Bruen*, however, Atkinson's claim remains contrary to controlling precedent and thus fails as a matter of law, as explained below.

**B.     Atkinson's Facial Challenge Fails Under *Bruen*'s Framework**

**1.     Controlling Case Law Confirms § 922(g)(1)'s Constitutionality**

Binding precedent forecloses any facial invalidation of § 922(g)(1) under the Second Amendment.[1]  As the Seventh Circuit held in *United States v. Gay*, such an "argument is hard to square with *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)," which affirmed "that the Second Amendment creates personal rights" and "pointedly stated that 'longstanding prohibitions on the possession of firearms by felons' are valid."  98 F.4th 843 (7th Cir. 2024).  In fact, in *McDonald v. Chicago*, the Supreme Court reiterated that all of the reservations and provisos in *Heller*, including the "prohibitions on the possession of firearms by felons," remain valid.  561 U.S. 742, 786 (2010) (plurality opinion).  If any doubt remained about *Heller*'s endorsement of § 922(g)(1)'s constitutionality post-*Bruen*, the Seventh Circuit resolved such uncertainty in *Gay*.

In the absence of any definitive invalidation of § 922(g)(1) by the Supreme Court itself, *Bruen* does not undermine the constitutionality of the statute.  *See Bruen*, 597 U.S. at 72 ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.  Nor does it decide anything about the kinds of weapons that people may possess.  Nor have we disturbed

---

[1] As part of today's ruling, this Court assumes, for the sake of the motion, that convicted felons constitute part of the "people" under the plain text of the Second Amendment.  *See United States v. Phillips*, No. 1:22-CR-00596, 2023 WL 9001124, at \*6 (N.D. Ill. Dec. 28, 2023) (The "plain text of the Second Amendment" provides "no reason to think that the word 'people' does not cover, on its face, all persons—including a person convicted of a felony."); *United States v. Duarte*, 137 F.4th 743, 755 (9th Cir. 2025) ("Duarte's status as a felon does not remove him from the ambit of the Second Amendment; he is one of 'the people' who enjoys Second Amendment rights.").

anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns.") (Alito, J., concurring); *id.* at 80–81 (endorsing the statement in *Heller* about the propriety of denying firearms to felons) (Kavanaugh, J., joined by the Chief Justice, concurring).

Indeed, in *United States v. Rahimi*, the Supreme Court again endorsed the presumptive constitutionality of a blanket prohibition on felons possessing firearms. 602 U.S. 680, 699 (2024) ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"). As numerous courts have observed, *Rahimi* reinforces the conclusion that § 922(g)(1) remains consistent with the Second Amendment. *See, e.g., United States v. Castillo,* No. 23 CR 113, 2025 WL 92565, at *4 (N.D. Ill. Jan. 14, 2025) ("The *Gay* Court wrote that the Supreme Court 'pointedly stated that longstanding prohibitions on the possession of firearms by felons are valid.' *Rahimi* made the same point."); *United States v. Young*, No. 23-10464, 2024 WL 3466607, at *9 (11th Cir. July 19, 2024), *cert. denied sub nom. Young v. United States*, 145 S. Ct. 1097 (2025) (observing that in *Rahimi*, the Court once again declared that the prohibition on the possession of firearms by felons remains "presumptively lawful"); *United States v. Philpot*, No. 23-3368, 2024 WL 3429177, at *7 n.2 (6th Cir. July 16, 2024) (observing that, in *Rahimi*, the Supreme Court endorsed § 922(g)'s constitutionality).

SA 8

Further bolstering the notion that § 922(g)(1) remains constitutional post-*Bruen*, the Supreme Court also vacated the Third Circuit's decision in *Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023), which found § 922(g)(1) unconstitutional as applied to a defendant whose criminal record included just a decades-old non-violent offense, and remanded the matter for further consideration in light of *Rahimi. See Garland v. Range*, 144 S.Ct. 2706 (2024).

In short*, as Rahimi, Gay,* and numerous other cases make clear, *Bruen* merely alters the relevant test for determining the scope of the Second Amendment but leaves intact prior binding case law upholding the constitutionality of § 922(g)(1). *See Gay,* 98 F.4th 843; *Rahimi*, 602 U.S. at 699.[2]

### 2. Historical Analysis Confirms § 922(g)(1)'s Constitutionality

Prior to *Gay*, the Seventh Circuit in this case declined to rule on the constitutionality of § 922(g)(1) under the *Bruen* standard, pending a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)" by this Court. *Atkinson*, 70 F.4th at 1022; *see also United States v. Jones*, No. 23-2459, 2024 WL 1427024, at *2 (7th Cir. Apr. 3, 2024) (acknowledging that "the historical assessment on the constitutionality" of § 922(g)(1) under *Bruen* remained "inconclusive" after *Atkinson).* Given *Gay*'s more recent (and binding) analysis of Supreme Court precedent,

---

[2] Just last month, the Seventh Circuit upheld the validity of another section of the challenged statute, § 922(k), confirming that *Bruen* altered the analysis but did not invalidate all categorical prohibitions on certain types of firearms possession. *See United States v. Reyna*, No. 23-1231, 2026 WL 221850, at *7 (7th Cir. Jan. 28, 2026) (finding that the statute, which punishes the knowing possession of deserialized firearms, remains consistent with the historical tradition of firearm regulation).

SA 9

however, an additional review by this Court of the historical evidence now appears unnecessary in this case.

Nevertheless, to the degree a separate historical analysis may be necessary in a post-*Gay* world, this Court finds that Defendants have presented historical evidence (not factually disputed by the parties) and carried their burden of answering the questions spelled out by the Court of Appeals.[3]  *See* [40-1] at 25–38, 42–44.  Based upon the record here, this Court adopts the well-reasoned historical review and legal analysis of Circuit Court Judge Wood in her dissent, 70 F.4th at 1025 ("My own assessment of the materials that now govern Second Amendment questions per *Bruen* convinces me that the categorical prohibition created by section 922(g)(1) passes muster under the Constitution.").[4]

---

[3] On appeal, the majority identified five questions to "help focus the proper analysis" in determining whether the statute is "consistent with this Nation's historical tradition of firearm regulation" under *Bruen*.  70 F.4th at 1023–24.  Nonetheless, it acknowledged that any trial court's historical analysis would "no doubt yield some measure of indeterminacy" and that, prior to receiving additional Supreme Court guidance, the courts would "have to give the best answer available" on whether the government met its historical-tradition burden.  *Id.* at 1024.  The Court finds that Defendants have met their burden in this regard here.

[4] Likewise, this Court incorporates by reference both the historical review and interpretation of Supreme Court precedent that has arisen from other persuasive authorities, each upholding the constitutionality of § 922(g)(1).  *See, e.g., United States v. Jackson*, 69 F.4th 495, 505–06 (8th Cir. 2023) ("In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms.  Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons.  Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.");  *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) ("The longstanding prohibition on possession of firearms by felons is constitutional, and the district court properly denied the motion to dismiss.");  *United States v. Whitney*, No. 22-10326, 2024 WL 1429461, at *2 (9th Cir. Apr. 3, 2024) ("Nothing in the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), reflects a retreat from the Court's earlier statement in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that 'longstanding prohibitions on the possession of firearms by felons and the mentally ill' are 'presumptively lawful.'");  *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir.

SA 10

### C.    Atkinson's As-Applied Challenge Also Fails

In addition to challenging § 922(g)(1) on its face, Mr. Atkinson claims that § 922(g)(1) remains unconstitutional as applied to him. *See* [26] at ¶¶ 43–46. As instructed, the Court thus considers the final question set forth by the majority on appeal: "If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony?" 70 F.4th at 1024.

Given this Court's constitutional analysis above, the historical evidence obviates the need for the case-by-case examination Atkinson requests. In other words, the answer to question five is that history does not support Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies. *See, e.g., United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("Given these assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."); *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of

---

2023) ("Though *Bruen* created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons. If anything, *Bruen* contains two potential signs of support for these prohibitions."); *United States v. Dubois*, 94 F.4th 1284, 1292–93 (11th Cir. 2024) ("The Supreme Court left no doubt that it viewed its decision as a faithful application of *Heller*, not a departure from it," confirming "that *Heller* correctly 'relied on the historical understanding of the Amendment to demark the limits on the exercise of that right.'"); *United States v. Phillips*, No. 1:22-CR-00596, 2023 WL 9001124, at *14 (N.D. Ill. Dec. 28, 2023) (The "historical analogues provided by the government support a legislative authority to disarm persons convicted of felonies, regardless of whether the conviction involved a use (or attempted use) of force.").

decisions—as far from the rule of law as one could image"); *United States v. Phillips*, No. 22-CR-00596, 2023 WL 9001124, at *14 (N.D. Ill. Dec. 28, 2023) ("Lastly, to the extent Phillips challenges the felon dispossession statute, as applied to him, that challenge fails.  Like Atkinson, Phillips fails to provide 'much historical basis for individualized assessments' or carveouts between 'individuals who committed violent versus non-violent crimes' for § 922(g)(1) purposes.") (citing *Atkinson*, 70 F.4th at 1023); *United States v. Duarte*, 137 F.4th 743, 761 (9th Cir. 2025) ("our historical tradition of categorically disarming those whom the legislature determines to represent a 'special danger of misuse' also supports the application of § 922(g)(1) to felons, like Duarte, who assert that their felonies were non-violent"); *id.* ("History does not require 'felony-by-felony litigation' to support the application of § 922(g)(1) to all felons.") (citing *Atkinson*, 70 F.4th at 1038 (Wood, J., dissenting)).

Thus, while Defendants "bear the burden of proving the constitutionality" of § 922(g)(1), *Bruen*, 597 U.S. at 24 (quoting *United States v. Playboy Entertainment Grp., Inc.*, 529 U.S. 803, 816 (2000), they can meet that burden, based upon this historical evidence, without delving into the individualized assessment Plaintiff's as-applied challenge demands.  *See, e.g., United States v. Young*, No. 2:22-CR-20 JD, 2023 WL 8697936, at *2–3 (N.D. Ind. Dec. 15, 2023) (The "historical record shows strong support for the ability to categorically prohibit a defined group from possessing arms based on the legislature's assessment the group was dangerous or untrustworthy, without individual dangerousness assessments of group members."); *United States v. Barwicks*, No. 20 CR 00563, 2024 WL 1521473, at *13–14 (N.D. Ill.

Apr. 8, 2024) (same); *United States v. Castillo*, No. 23 CR 113, 2025 WL 92565, at \*6 (N.D. Ill. Jan. 14, 2025) (rejecting the defendant's as-applied challenge to § 922(g)(1) because the Seventh Circuit has never upheld an as-applied Second Amendment challenge to § 922(g)(1); the defendant offered no "support for his proposition that the statute's constitutionality turns on individualized assessments" and "the historical evidence points to an opposite conclusion—laws in American colonies and 17th-century England suggest that felons, both violent and non-violent, were targeted for firearm dispossession."). Thus, neither the Supreme Court nor the Seventh Circuit has endorsed the individualized assessment Mr. Atkinson seeks.[5]

To be clear, the Seventh Circuit has not yet definitively ruled upon the issue,[6] but several Circuit Courts have, in fact, rejected the notion that convicted felons whose predicate offenses were "non-violent" remain constitutionally exempt from § 922(g)(1)'s blanket ban on felons possessing firearms. In *United States v. Hunt*, 123

---

[5] In her dissent in *Kanter v. Barr*, then Circuit Judge Barrett observed that § 922(g)(1) "would stand on solid footing if their categorical bans were tailored to serve the governments' undeniably compelling interest in protecting the public from gun violence. But their dispossession of all felons—both violent and nonviolent—is unconstitutional as applied to Kanter, who was convicted of mail fraud for falsely representing that his company's therapeutic shoe inserts were Medicare-approved and billing Medicare accordingly." 919 F.3d 437, 451 (7th Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). But the majority opinion (binding here) rejected that view, observing instead that there "may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case." *Kanter*, 919 F.3d at 450 n.12.

[6] In *United States v. Carbajal-Flores*, 143 F.4th 877, 889 (7th Cir. 2025), the Seventh Circuit expressed "no views on whether criminal defendants may lodge as-applied challenges" to certain provisions of § 922(g)'s subsections." Although the court observed that "the class of persons disarmed under § 922(g)(1) is potentially overinclusive," i*d*. at \*9, it neither conducted an historical review, nor provided any analysis on that question because the plaintiff in that case brought facial and as-applied challenges to § 922(g)(5)(A), which the court wholly rejected. *Carbajal-Flores* thus merely identifies, without resolving, the question Atkinson presents, and this Court remains convinced by the weight of circuit authority, discussed herein, affirming the validity of § 922(g)(1)'s application to non-violent felons based upon long-standing regulatory practice in American law.

12

F.4th 697 (4th Cir. 2024), the Fourth Circuit identified a historical tradition of regulating gun possession by non-violent criminal offenders because "colonial-era offenders who committed non-violent hunting offenses were ordered to forfeit their firearms," and colonial governments disarmed individuals for non-violent offenses such as refusing to participate in the Church of England or refusing to declare an oath of loyalty. *Id.* at 705–706. In fact, the Fourth Circuit held that, in that Circuit, a person convicted of *any* felony "cannot make out a successful as-applied challenge to § 922(g)(1) unless the felony is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful." *Id.* at 700.

Similarly, the Eighth Circuit has determined that "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society," and thus held that, even post-*Bruen* and *Rahimi*, "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *United States v. Jackson*, 110 F.4th 1120, 1125, 1128 (8th Cir. 2024); *see also United States v. Peck*, 131 F.4th 629, 632 (8th Cir. 2025) (same).

As part of a growing consensus, the Tenth Circuit has likewise held that, post-*Bruen* and *Rahimi*, § 922(g) remains constitutional, whether as applied to felons who committed violent crimes or to felons who committed non-violent crimes. In *United States v. Warner*, 131 F.4th 1137 (10th Cir. 2025), the defendant argued that the Second Amendment prohibits the application of § 922(g)(1) to non-violent felons like him, because non-violent felons are not dangerous and therefore retain the same right

13

to keep and bear arms as do non-felons.  The defendant, like Mr. Atkinson here, emphasized that his felonies, non-violent to begin with, stemmed from decades-old convictions, and did not subject him to a term of imprisonment (he also argued, unlike Mr. Atkinson, that his felonies would today be treated only as a misdemeanor under state law).  *Id.* at 1147.  The Tenth Circuit rejected the challenge, holding that, despite "the shifting Second Amendment landscape," § 922(g)(1) remains "constitutional as applied to non-violent felons."  *Id.* at 1148–49.  *See also Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025) (even post-*Bruen* and *Rahimi*, "the Second Amendment doesn't prevent application of § 922(g)(1) to nonviolent offenders").

The Second and Ninth Circuits have also held that § 922(g)(1) is not unconstitutional as applied to non-violent felons.  *Zherka v. Bondi*, 140 F.4th 68, 91–93 (2d Cir. 2025); *United States v. Duarte*, 137 F.4th at 750, 762.  In the absence of binding authority to the contrary, this Court finds these cases persuasive.

Moreover, even if an as-applied challenge remains viable for some categories of felons, *Gay*, 98 F.4th 843, the record in this case demonstrates that Defendant would still fall outside any such category.[7]  Here, Atkinson did not plead guilty to a minor felony violation, and instead admitted to engaging in mail fraud, a serious felony offense that "reflects significant disrespect for the law" and "carries a

---

[7] In dicta, the *Gay* court suggested that, even if convicted felons *could* assert a non-frivolous as-applied challenge, any such challenge mounted by Gay would fail because he was, by no means, a "law-abiding, responsible citizen" given the nature of his criminal history.  98 F.4th 843.

14

maximum penalty of twenty years in prison and a $250,000 fine." *Kanter*, 919 F.3d at 440, 450. Atkinson does not dispute the gravity of his felony conviction; instead, he argues that the timing and nature of his crime (ostensibly non-violent), the nature of his punishment (non-custodial), and his stellar track record since his punishment concluded all merit revisiting the question of whether he should remain subject to § 922(g)(1)'s blanket prohibition on firearm possession. The record, however, undermines this claim and absent specific guidance from the Supreme Court or the Seventh Circuit requiring a detailed, case-by-case analysis of individual felons' character, propensity for violence, rehabilitation, etc., the Court need not address the issue further.[8]

## IV.    Conclusion

Having considered Atkinson's claims anew under the framework set forth in *Bruen* and its progeny, the Court finds that Atkinson's facial and as-applied challenges to § 922(g)(1) fail as a matter of law. As a result, the Court grants Defendants' motion to dismiss [40] and dismisses this case with prejudice.

Dated: February 6, 2026

Entered:

John Robert Blakey
United States District Judge

---

[8] In making his as-applied challenge, Atkinson emphasizes that his felony conviction did not result in a custodial sentence. But that argument ignores the plain language of the statute. *See* 18 U.S.C. § 922(g) (providing "It shall be unlawful for any person--(1) who has been convicted in any court of, a crime *punishable by* imprisonment for a term exceeding one year . . .," not *punished by*) (emphasis added). It also ignores binding precedent. *See Hatfield v. Barr*, 925 F.3d 950, 952 (7th Cir. 2019) (holding that "§ 922(g)(1) may be applied to a felon convicted of fraud, whose maximum sentence exceeded a year, even if the actual punishment was less.").

15

SA 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERRICK B. GARLAND, in his official | ) | No. 1:21 CV 291 |
| Capacity as Attorney General of the United | ) | |
| States, and STEVEN M. DETTLEBACH, | ) | |
| in his official capacity as Director of the | ) | |
| Bureau of Alcohol, Tobacco, Firearms | ) | |
| and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |

AMENDED COMPLAINT

Plaintiff, PATRICK ATKINSON, by and through LAW FIRM OF DAVID G.

SIGALE, P.C., his attorney, and for his Amended Complaint against the

Defendants, MERRICK B. GARLAND, in his official capacity as Attorney General

of the United States of America, and STEVEN M. DETTLEBACH, in his official

capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

("BATFE")[1], states and alleges as follows:

INTRODUCTION

Twenty-five years ago, Plaintiff Patrick Atkinson ("Atkinson") unknowingly

played a small part in a corporate recruiting scam, perpetrated by an employee in

---

[1] In Plaintiff's originally-filed Complaint, Jeffrey Rosen and Regina Lombardo, as Acting
Attorney General and Deputy Director of BATFE, respectively, were the named
Defendants. Pursuant to F.R. Civ. P. 25(d), the now-named Defendants, as the current
holders of those offices, are substituted herein.

SA 17

the recruiting department at a large Illinois company, and was convicted of a felony, still his only violation of the law. Atkinson paid a fine, received two years probation, which was ended a year early, with six months of home confinement. Due to the federal prohibition of felons ever legally possessing firearms in 18 U.S.C. § 922(g)(1), Atkinson has been permanently and unconstitutionally deprived of his right to armed self-defense under the Second Amendment.

This action seeks equitable, declaratory, and injunctive relief challenging on a facial and as-applied basis the application of 18 U.S.C. § 922(g)(1) to Atkinson as a non-violent and non-dangerous felon, who wishes to avail himself of the Second Amendment right.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202.

2. Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a substantial part of the events and omissions giving rise to the claim occurred, and the Plaintiff resides, in this judicial district.

## PARTIES

3. Plaintiff, Patrick Atkinson, is a natural person residing in Glen Ellyn, Illinois. Atkinson is 65 years old. He is married with two grown children. Atkinson presently intends to obtain an Illinois Firearm Owners Identification Card ("FOID card"), pursuant to the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1, *et seq,* ("FOID Card Act") so that he may lawfully possess a firearm for self-

2

SA 18

defense within his own home, and other lawful purposes such as range training, but is prevented from doing so only by Defendants' active enforcement of unconstitutional laws complained of in this action.

4.      Defendant, Merrick B. Garland, is the Attorney General of the United States of America, and is sued only in his official capacity. As Attorney General, Garland is responsible for executing and administering laws, customs, practices, and policies of the United States, and is presently enforcing the laws, customs, practices and policies complained of in this action.

5.      Defendant, Steven M. Dettlebach, is the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), and is sued only in his official capacity. As Director of BATFE, Dettlebach is responsible for executing and administering laws, customs, practices, and policies of the United States, and is presently enforcing the laws, customs, practices and policies complained of in this action.

<u>STATEMENT OF FACTS</u>

*Plaintiff's Background*

6.      Patrick Atkinson is 65 years old and thus over the age of 21, is not under indictment, has never been convicted of a crime of domestic violence, is not a fugitive from justice, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a

3

SA 19

restraining order relating to an intimate partner. He is married with two grown children.

7. On October 16, 1998, Atkinson pleaded guilty to, and was convicted, in the Northern District of Illinois Case No. 1:98-CR-00730-03, of one count of frauds and swindles, in violation of 18 U.S.C. § 1341, a Class C felony. The facts underlying the conviction are as follows:

8. In 1998, Atkinson was an Executive Recruiter with his own company, Waterford Executive Group, which he opened in 1990. One of his clients, his co-Defendant (Zerba), was in the recruiting department at a large Illinois company that specialized in consultants and outsourcing. Atkinson would place actuaries and consultants at the company and receive a consulting fee.

9. In or around 1998, Zerba offered Atkinson a moonlighting job, where Zerba would find professional candidates, and Atkinson would place them with employers, and they would split the recruiting fee. This happened a couple of times without incident.

10. A few months later, Zerba sent Atkinson the resume of a recruiting candidate from Virginia. Atkinson tried to place the man in an executive position but could not. Eventually, Zerba told Atkinson he thought the man would be a good fit at his own company, and the man was hired. Atkinson believed he would keep the recruiting fee since the candidate was placed at Zerba's own company where Zerba worked as a recruiter. However, Zerba demanded half of the fee and Atkinson gave it to him.

4

SA 20

11.    Soon thereafter, Zerba sent Atkinson another candidate for placement at Zerba's own company. Atkinson thought it seemed suspicious, and declined.

12.    Soon after that, Zerba called Atkinson and said that he (Zerba) had been fired over referrals and that the police were investigating. When U.S. Postal Inspectors contacted Atkinson, he cooperated fully. Atkinson learned that Zerba was masterminding the scheme with a number of other recruiters, and that Atkinson was unknowingly part of a "hub and spoke" operation, where Atkinson turned out to be just one of multiple spokes.

13.    For his share of one recruiting fee that totaled $6,000.00, Atkinson was sued by Zerba's employer for $150,000.00 for fraud, civil RICO violations, and conspiracy. Atkinson ultimately settled for $45,000.00, and spent $15,000.00 in legal fees.

14.    Atkinson was then charged with mail fraud (frauds and swindles) and quickly pleaded guilty. On February 24, 1999, Atkinson was sentenced to two years of probation with six months of home confinement, a fine of $15,000.00, and 200 hours of community service. He completed all his sentencing terms, and his probation was even terminated a year early, without objection from the Government, on March 7, 2000.

15.    Other than the above referenced offense, Atkinson has never been charged or convicted of any offense which makes him ineligible to possess firearms under 18 U.S.C. § 922(g), or state law, and but for the above referenced charge, no federal law would prohibit Atkinson's possession of firearms.

SA 21

16. Atkinson acknowledges that his behavior was wrong. While he did not set out to commit any criminal act, he knows he should have been more suspicious of the circumstances of the subject transaction, and should have walked away from a situation that did not feel right and was soon thereafter confirmed to be illegal.

17. However, since that time, he owns two companies: Waterford Executive Group, the aforementioned executive recruiting firm; and Atkinson Ergonomic Solutions, Inc, which was formed in 2018, and which has created a device for lifting hotel beds for greater ease and efficiency of both making the beds and cleaning underneath them. Atkinson has not been convicted of any further offenses, including any crime of violence or threatened violence.

18. Atkinson is a law-abiding citizen, and has been for several decades.

19. However, owing to his felony conviction, Atkinson is permanently prohibited by Defendants from following through with his intent to obtain and possess a firearm for self-defense and other lawful purposes, based on Defendants' enforcement of 18 U.S.C. § 922(g)(1).

20. Also owing to his felony conviction, Atkinson is unable to obtain an Illinois FOID card, pursuant to 430 ILCS 65/4(a)(2)(ii) and 65/8(c) and (n), and 65/10(c)(4). Once the federal prohibition is removed, however, the barrier to Atkinson applying for and ultimately receiving a FOID card will be removed.

21. Atkinson refrains from possessing a firearm for self-defense and other lawful purposes only because he reasonably fears arrest, prosecution, incarceration

SA 22

and fine pursuant to 18 U.S.C. § 922(g)(1), and 430 ILCS 65/14(c)(3), should he possess a firearm.

22.    Atkinson has a fundamental right to keep and bear arms in the home for self-defense and for other lawful purposes, and this fundamental right is being violated facially and as-applied to Atkinson, who committed a non-violent felony 25 years ago.

23.    Atkinson challenges the Defendants' ability to categorically prohibit him - as a non-violent felon - from possessing arms pursuant to 18 U.S.C. § 922(g)(1).

24.    Additionally, in the alternative, and to the extent it is relevant under Second Amendment analysis, Atkinson challenges the constitutionality of categorically prohibiting him from possessing arms while at the same time affording him no opportunity, no matter the merits, short of a Presidential pardon, for an individualized assessment to show he is capable of safely and lawfully possessing arms, and thus restoring his civil rights.

### *Defendants' Regulatory Scheme*

#### *Federal Law*

25.    Title 18, United States Code § 922(g)(1) prohibits the possession of firearms by any person convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony criminal offense punishable by fine and imprisonment of up to ten years. *See* 18 U.S.C. § 924(a)(2).

SA 23

26.     Further, Title 18, United States Code § 922(d)(1) prohibits anyone from transferring firearms or ammunition to anyone whom the transferor has reason to know was convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony criminal offense punishable by fine and imprisonment of up to ten years. See 18 U.S.C. § 924(a)(2).

27.     All firearms purchasers within the United States who do not possess a Federal Firearms License, meaning, virtually all ordinary civilian consumers of firearms, must complete "Form 4473, Firearms Transaction Record Part I –Over-The-Counter," administered under Defendants' authority, in order to purchase a firearm. 27 C.F.R. § 478.124. Per BATFE revisions effective August, 2023, Question 21(d) on Form 4473 asks:

> Have you ever been convicted in any court, including a military court, of a **felony**, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (boldface in original)

28.     Defendants instruct firearm dealers not to sell firearms to anyone who answers "yes" to this question. Indeed, Defendants instruct firearm dealers to refrain from even running a background check on anyone who answers yes to this question, and simply to deny the transaction on the basis of that answer:

> If a prospective purchaser answered "yes" to any of the questions on the ATF Form 4473 (other than questions 9 a. and 9 l. of the 10/98 edition), you should not contact the NICS because the subject is prohibited from purchasing.

SA 24

BATF FFL Newsletter, May, 2001, Issue I, at 14, available at

http://www.atf.gov/files/publications/newsletters/ffl/ffl-newsletter-2001-05.pdf (last

visited October 8, 2023).

> If the prospective purchaser answers "yes" to any of the questions [regarding eligibility to possess firearms], the licensee has reasonable cause to believe that the transferee is prohibited. Accordingly, the transfer of a firearm to such a person would be in violation of Federal law. This is true regardless of whether the licensee received an "proceed" or "denied" response from NICS. In fact, there is no reason for the licensee to even contact NICS after a person indicates on the Form 4473 that he or she is prohibited from receiving firearms. The licensee should simply advise the prospective purchaser that the firearm may not be transferred.

BATF FFL Newsletter, September 1999, Issue II, at 2, available at

https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-

september-1999/download (last visited October 8, 2023).

29.    BATFE also instructs FFLs, in relevant part, that "[a] person has

given you reason to believe he or she is prohibited, and the transaction must be

stopped, if the person answers:

> "Yes" to a question on the ATF Form 4473 (5300.9) that asks:
>
> - "Are you under indictment or information in any court for a **felony**, or any other crime for which the judge could imprison you for more than one year, or are you a current member of the military who has been charged with violation(s) of the Uniform Code of Military Justice and whose charge(s) have been referred to a general court-martial?"
>
> - "Have you ever been convicted in any court, including a military court, of a **felony**, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation?"

9

SA 25

*See* https://www.atf.gov/firearms/federal-firearms-licensee-quick-reference-and-best-practices-guide (last visited October 8, 2023) (boldface in original).

*State Law*

30. Illinois prohibits the possession of firearms by any Illinois resident without a FOID card. *See* 430 ILCS 65/2(a)(1).

31. Illinois prohibits persons from obtaining a FOID card if the granting of same would be contrary to federal law, such as, in the instant case, if one has a felony conviction. *See* 430 ILCS 65/4(a)(2)(ii), 65/8(c) and (n), 65/10(c)(4).

32. Possession of a firearm by an Illinois resident without a FOID card, and who is not eligible to obtain a FOID card, is a Class C felony. *See* 430 ILCS 65/14(c)(3).

**COUNT I**
**RIGHT TO KEEP AND BEAR ARMS**
**(U.S. CONST. AMEND. II)**

33. The allegations of paragraphs 1 through 32 are incorporated as though fully set forth herein.

34. The Second Amendment to the United States Constitution provides: "A wellregulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

35. The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 805–06 (2010); *id.* at 805 (Thomas, J., concurring).

SA 26

36.     Atkinson is one of "the people" who possesses Second Amendment rights, per *District of Columbia v. Heller*, 554 U.S. 570, 580-81 (2008). As such, pursuant to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), "the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

37.     The Supreme Court has therefore stated the test for addressing Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30.

38.     18 U.S.C. § 922(g)(1) regulates Second Amendment conduct. Atkinson's request to possess a firearm to defend himself at home, and for other lawful purposes, squares exactly with the constitutional right as defined by *Heller*. 554 U.S. at 582 ("[T]he Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). Therefore "the Second Amendment's plain text covers [Atkinson's desired] conduct," and "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

11

39.     The prohibition on Atkinson possessing firearms for self-defense, as imposed by 18 U.S.C. § 922(g)(1), is not consistent with the Nation's historical tradition of firearm regulation.

40.     Defendants' enforcement of 18 U.S.C. § 922(g)(1) is an infringement and an impermissible burden on Atkinson's right to keep and bear arms for self-defense and other lawful purposes pursuant to the Second Amendment to the United States Constitution.

41.     Defendants' enforcement of 18 U.S.C. § 922(g)(1) forces Atkinson either to comply with the unconstitutional mandate—thereby being prevented from exercising his rights under the Second Amendment to the United States Constitution—or be subjected to criminal prosecution.

42.     Therefore, as a direct and proximate result of the above infringement and impermissible burden on Atkinson's Second Amendment rights, Atkinson has suffered—and continues to suffer—from an unlawful and irreparable deprivation of his fundamental constitutional right to keep and bear arms. Defendants have violated Atkinson's Second Amendment right to keep and bear arms by precluding him from being able to purchase or possess firearms for self-defense and other lawful purposes via the enforcement of 18 U.S.C. § 922(g)(1).

12

## COUNT II
## INDIVIDUALIZED, AS-APPLIED CLAIM FOR RELIEF -
## RIGHT TO KEEP AND BEAR ARMS
## (U.S. CONST. AMEND. II)

43.    The allegations of paragraphs 1 through 42 are incorporated as though fully set forth herein.

44.    Atkinson is a responsible, law-abiding American citizen. He has no history of violent behavior, or of any other conduct that would suggest he would pose any more danger by possessing firearms than an average, law-abiding responsible citizen. Atkinson is unlikely to act in a manner dangerous to public safety, and his possession of firearms would not be contrary to the public interest.

45.    On account of Atkinson's unique personal circumstances, including but not limited to the nature of his felony conviction, the passage of time since that conviction, Atkinson's law-abiding record over the years, his trustworthiness with firearms and the lack of danger that his possession of firearms would pose, and to the extent such unique personal circumstances are relevant to the *Bruen* analysis, it is an unconstitutional violation of Atkinson's Second Amendment rights to apply the firearms prohibition of 18 U.S.C. § 922(g)(1) against Atkinson personally, solely on account of his 1998 fraud conviction.

46.    To the extent Atkinson's unique personal circumstances are relevant to the *Bruen* analysis, Atkinson requests a hearing before the Court to demonstrate that he meets any required fact-based standard required by *Bruen* and the Second Amendment.

13

SA 29

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, PATRICK ATKINSON, respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, and declare and order the following forms of relief:

1. A declaration that application of 18 U.S.C. § 922(g)(1) against Patrick Atkinson, on account of his non-violent 1998 felony conviction under 26 U.S.C. § 7206(1), violates the Second Amendment to the United States Constitution;

2. A declaration that 18 U.S.C. § 922(g)(1) cannot be applied against Patrick Atkinson on account of his 1998 felony conviction under 26 U.S.C. § 7206(1);

3. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 18 U.S.C. § 922(g)(1) against Patrick Atkinson on the basis of his 1998 felony conviction under 26 U.S.C. § 7206(1);

4. Costs of suit;

5. Attorney's Fees and Costs pursuant to 28 U.S.C. § 2412; and

SA 30

6.       Any other further relief as the Court deems just and appropriate.


Dated:   October 9, 2023                        _____/s/ David G. Sigale_____
                                                Attorney for Plaintiff



David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

SA 31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAMELA BONDI, in her official | ) | Case No. 1:21 CV 291 |
| capacity as Attorney General of the United | ) | |
| States, and DANIEL DRISCOLL, in his | ) | |
| official capacity as Acting Director of the | ) | |
| Bureau of Alcohol, Tobacco, Firearms | ) | |
| and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |

<u>NOTICE OF APPEAL</u>

Plaintiff, PATRICK ATKINSON, does hereby appeal to the United States

Court of Appeals for the Seventh Circuit from the judgment of this Court entered on

February 9, 2026, that granted Defendants' F.R. Civ. P. 12(b)(6) Motion to Dismiss

(Dkt. #72), and the opinion stating same, entered on February 6, 2026 (Dkt. #71).

By: _____/s/ David G. Sigale_____
David G. Sigale
Attorney for Plaintiff

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

SA 32

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

1.      On February 12, 2026, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

2.      Pursuant to F.R. Civ. P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


            /s/ David G. Sigale
            Attorney for Plaintiff


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

SA 33