No. 26-1356

# In the United States Court of Appeals for the Seventh Circuit

◆

PATRICK ATKINSON,

*Plaintiff–Appellant,*

v.

TODD W. BLANCHE, in his official capacity as Acting Attorney General of the United States, and ROBERT CEKADA, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants–Appellees.*

◆

Appeal from the United States District Court
for the Northern District of Illinois
No. 1:21-cv-00291
The Honorable John Robert Blakey

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA, FIREARMS POLICY COALITION, AND FPC ACTION FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF–APPELLANT**

◆

JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION –
INSTITUTE FOR LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org
*Counsel of Record*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1356

Short Caption: Atkinson v. Blanche

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 National Rifle Association of America, Firearms Policy Coalition, and FPC Action Foundation


(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 National Rifle Association - Institute for Legislative Action


(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Joseph G.S. Greenlee    Date: 5/7/2026

Attorney's Printed Name:  Joseph G.S. Greenlee

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑ **No** ☐

Address:  11250 Waples Mill Road

    Fairfax, VA 22030

Phone Number: (703) 267-1161    Fax Number:  (703) 267-3999

E-Mail Address: jgreenlee@nrahq.org

rev. 12/19 AK

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ....................................................... ii

TABLE OF AUTHORITIES................................................... iii

STATEMENT OF *AMICI CURIAE* ........................................1

CONSENT TO FILE ........................................................2

SUMMARY OF ARGUMENT ...................................................3

ARGUMENT ................................................................5

    I.    All firearm regulations must be justified by historical tradition, even regulations the Supreme Court has deemed "presumptively lawful."................................................5

    II.   Historical tradition supports disarming only dangerous persons...........................................................7

       A.   In colonial America, arms restrictions targeted dangerous persons. ...................................................7

       B.   Founding-Era restrictions applied to enemies of the government and other dangerous persons. .............................18

       C.   Nineteenth-century arms prohibitions applied to slaves and freedmen, while lesser restrictions focused on dangerous persons. .................................................27

   III. Nonviolent felons and other "unvirtuous" persons were expressly permitted and often required to keep arms. ................32

CONCLUSION .............................................................34

CERTIFICATE OF COMPLIANCE.............................................35

CERTIFICATE OF SERVICE.................................................36

# TABLE OF AUTHORITIES

**CASES**

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ......................................................................... *passim*

*Parman v. Lemmon,*
119 Kan. 323 (1925) ............................................................................29

*Pena-Rodriguez v. Colorado,*
580 U.S. 206 (2017) ...............................................................................9

*Ramos v. Louisiana,*
590 U.S. 83 (2020) ..................................................................................8

*State v. Hogan,*
63 Ohio St. 202 (1900)........................................................................28

*State v. Shelby,*
90 Mo. 302 (1886) ...............................................................................29

*United States v. Rahimi,*
602 U.S. 680 (2024) ...................................................................7, 8, 30

*Worcester v. State of Ga.,*
31 U.S. 515 (1832).............................................................................10

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. II.................................................................*passim*

**STATUTES AND REGULATIONS**

1777 N.J. Laws 90, ch. 40 §20..............................................................21

1786 Mass. Acts 265 ...........................................................................33

1787 Mass. Acts 13–14 ................................................................23

1787 Mass. Acts 555–56 ............................................................23

1 Stat. 271 (1792) ......................................................................32

1806 Md. Laws 45 ........................................................................9

1851 Ky. Acts 296 §12 ...............................................................27

1863 Del. Laws 332 §7 ...............................................................27

1867 Kan. Sess. Laws 25 ...........................................................30

1868 Kan. Sess. Laws 378 .........................................................29

1878 Miss. Laws 175-76 ............................................................29

1878 N.H. Laws 170 ..................................................................28

1878 Vt. Acts & Resolves 30 .....................................................28

1879 Conn. Pub. Acts 394 .........................................................28

1879 Del. Laws 225 ...................................................................28

1879 N.C. Sess. Laws 355 .........................................................28

1879 Ohio Laws 192 ..................................................................28

1879 Pa. Laws 34 .......................................................................28

1879 Wis. Sess. Laws 274 .........................................................28

1880 Mass. Acts 232 .................................................................28

1880 N.Y. Laws 297 ..................................................................28

1880 R.I. Acts & Resolves 110 ..................................................28

Miss. Rev. Code ch. 77, §2964 (1880) ......................................28

1883 Kan. Sess. Laws 159 .........................................................29

1890 Iowa Acts 69..................................................................................28

18 U.S.C. §922(g)(1)...........................................................................3, 4

**OTHER AUTHORITIES**

*A History of the King's American Regiment, Part 1*, THE ON-LINE
    INSTITUTE FOR ADVANCED LOYALIST STUDIES .......................................18

AMERICAN ARCHIVES, vol. 2 (4th Ser., Peter Force ed., 1839).................19

AMERICAN ARCHIVES, vol. 4 (4th Ser., Peter Force ed., 1843).................19

AMERICAN ARCHIVES, vol. 5 (4th Ser., Peter Force ed., 1844)...........20, 22

AMERICAN ARCHIVES, vol. 6 (4th Ser., Peter Force ed., 1846).................20

AMERICAN ARCHIVES, vol. 2 (5th Ser., Peter Force ed., 1851).................20

Aptheker, Herbert, AMERICAN NEGRO SLAVE REVOLTS (1943)..................9

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL
    ASSEMBLY, APRIL, 1684 – JUNE, 1692, vol. 13 (William Hand
    Browne ed., 1894).................................................................................33

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL
    ASSEMBLY, APRIL, 1715 – AUGUST, 1716, vol. 30 (William Hand
    Browne ed., 1910).................................................................................34

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL
    ASSEMBLY, 1752–1754, vol. 50 (J. Hall Pleasants ed., 1933) ........13, 14

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL
    ASSEMBLY, 1755–1756, vol. 52 (J. Hall Pleasants ed., 1935) ..............13

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE
    AMERICAN TRADITION, vols. 1–14 (Arthur Vollmer ed., 1947).............32

Berthold Fernow, *The Middle Colonies*, *in* NARRATIVE AND CRITICAL
    HISTORY OF AMERICA, vol. 5, part I (Justin Winsor ed., 1887) ............11

Boatner III, Mark M., ENCYCLOPEDIA OF THE AMERICAN REVOLUTION (3d ed. 1994) ..................................................................18

Brief for *Amici Curiae* Second Amendment Law Scholars in Support of Petitioner, Aug. 21, 2023, *United States v. Rahimi*, No. 22-915 ......8

Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners, July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843..................................8

Butterfield, Kevin, *Puritans and Religious Strife in the Early Chesapeake*, THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY, vol. 109, No. 1 (2001) ..............................14, 15

Campbell, Charles, HISTORY OF THE COLONY AND ANCIENT DOMINION OF VIRGINIA (1860)..................................................16

CATHOLICITY IN PHILADELPHIA (Joseph L. J. Kirlin ed., 1909) ...............12

Cohn, Norman, THE PURSUIT OF THE MILLENNIUM: REVOLUTIONARY MILLENNARIANS AND MYSTICAL ANARCHISTS OF THE MIDDLE AGES (1957)..................................................................17

Frank, Joseph, *News from Virginny, 1644*, THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY, vol. 65, No. 1 (1957)..............................15

Friedman, Lawrence, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1993)..................................................................29

Greene, Evarts Boutell, THE PROVINCIAL GOVERNOR IN THE ENGLISH COLONIES OF NORTH AMERICA (1898)..............................15

Greenlee, Joseph G.S., *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1 (2024)..............................................................9, 10, 21

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 3 (1820) ....................34

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 4 (1820) ....................34

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 7 (1820) .................... 13

HOLMES COUNTY REPUBLICAN, Oct. 30, 1856 ........................................... 31

Holmes, John, THE STATESMAN, OR PRINCIPLES OF LEGISLATION AND LAW (1840) .................................................................................. 31

Johnson, Nicholas et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021) ........ 9, 10

Johnson, Samuel, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773) .................................................................................... 24

*Johnson's Wonder-Working Providence 1628–1651, in* COLLECTIONS OF THE MASSACHUSETTS HISTORICAL SOCIETY, vol. 7 (2d ser., 1818) (1654) .................................................................. 16, 17

LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN, vol. 2 (1810) ............................................. 33

Letter from Governor Benjamin Fletcher to Lords of Trade and Plantations, June 10, 1696, *in* 15 CALENDAR OF STATE PAPERS, COLONIAL SERIES, AMERICA AND WEST INDIES, 15 MAY, 1696 – 31 OCTOBER, 1697 (J. W. Fortescue ed., 1904) .......................................... 11

Letter from Thomas Jefferson to George Hammond, May 29, 1792, *in* THE WORKS OF THOMAS JEFFERSON, vol. 3 (H. A. Washington ed., 1884) ................................................................ 22

MARYLAND GAZETTE, Oct. 10, 1754 ......................................................... 13

MARYLAND GAZETTE, Oct. 17, 1754 ......................................................... 13

NEW-YORK DAILY TRIBUNE, Oct. 2, 1856 ................................................. 31

*No. XI*, FEDERAL GAZETTE, Nov. 28, 1788 ............................................. 25

Noble, John, A FEW NOTES ON THE SHAYS REBELLION (1903) ................ 22

Parton, James, THE LIFE OF HORACE GREELEY, EDITOR OF THE NEW YORK TRIBUNE (1869) ........................................................................27

PENNSYLVANIA GAZETTE, June 13, 1754.................................................12

RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 1628–1641, vol. 1 (Nathaniel B. Shurtleff ed., 1853) ...................................................................................... 16, 17

Sheridan, Thomas, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1789).......................................................................24

Smith, Oliver Hampton, EARLY INDIANA TRIALS AND SKETCHES (1858)..................................................................................................30

Surby, R.W., GRIERSON RAIDS (1865) .....................................................31

THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA (1782)..........................................................................21

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 2 (Merrill Jensen et al. eds., 1976) ......................25

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 28 (John P. Kaminski et al. eds., 2017) ...............23

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 5 (John P. Kaminski et al. eds., 1998) .................26

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 6 (John P. Kaminski et al. eds., 2000) ......................................................................... 23, 24, 25, 26

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 7 (John P. Kaminski et al. eds., 2001) .................26

THE GENERAL LAWS OF THE STATE OF CALIFORNIA FROM 1850 TO 1864, INCLUSIVE, vol. 2 (Theodore H. Hittell ed., 1868)................................28

THE LIBERATOR, Aug. 22, 1856 ..............................................................31

THE LOWER NORFOLK COUNTY VIRGINIA ANTIQUARY, No. 2, Pt. 1
(Edward W. James ed., 1897) ...............................................16

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE
UNION WITH NEW HAVEN COLONY, MAY 1665 (J. Hammond
Trumbull ed., 1850)...............................................................33

THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA,
vol. 1 (Richard Peters ed., 1845).........................................33

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, vol. 5
(Wm Stanley Ray ed., 1898) ...............................................12

THE TOPEKA DAILY CAPITAL, Feb. 2, 1883 ..............................31

THE WORKS OF JAMES WILSON, vol. 2 (James DeWitt Andrews ed.,
1896)...............................................................................32, 33

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(1828)................................................................................24

WEEKLY GLOBE, Dec. 10, 1842...............................................30

Winthrop, John, THE HISTORY OF NEW ENGLAND FROM 1630 TO
1649 (James Savage ed., 1826)........................................15, 26

**STATEMENT OF *AMICI CURIAE*[1]**

The National Rifle Association of America (NRA) is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union veterans—a general and a colonel—who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

Firearms Policy Coalition, Inc. (FPC) is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research,

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. Only *amici* and their members contributed money intended to fund its preparation or submission.

1

litigation, education, and outreach programs. Since its founding in 2014, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus curiae*.

FPC Action Foundation (FPCAF) is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on litigation, research, education, and other related efforts to inform the public about the importance of constitutionally protected rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms guaranteed by the Constitution are secured for future generations. FPCAF's research and *amicus curiae* briefs have been relied on by judges and advocates across the nation.

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court has repeatedly stated that its text-and-history test applies to all firearm regulations—even those it has deemed "presumptively lawful," such as prohibitions on the possession of firearms by felons. As applied to nonviolent felons, 18 U.S.C. §922(g)(1) fails that test.

The Supreme Court analyzed the Second Amendment's plain text and concluded that the right "belongs to *all* Americans." Therefore, under the Court's test, the government can justify disarming Atkinson only by demonstrating that Section 922(g)(1), as applied to nonviolent offenders such as Atkinson, is consistent with America's historical tradition of firearm regulation.

America's historical tradition of firearm regulation allows for the disarmament of demonstrably dangerous persons—disaffected persons posing a threat to the government and persons with a proven proclivity for violence. But there is no historical tradition of disarming peaceable citizens. Rather, peaceable citizens—including nonviolent felons and other "unvirtuous" persons—were expressly permitted and often required to keep and bear arms.

3

Section 922(g)(1) therefore violates the Second Amendment as applied to nonviolent offenders, including Atkinson.

## ARGUMENT

**I. All firearm regulations must be justified by historical tradition, even regulations the Supreme Court has deemed "presumptively lawful."**

The Supreme Court has repeatedly stated that its text-and-history test applies to all firearm regulations—even those it has deemed "presumptively lawful," such as prohibitions on the possession of firearms by felons. *See District of Columbia v. Heller*, 554 U.S. 570, 626–27, n.26 (2008).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court set forth "*the standard* for applying the Second Amendment":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. 1, 24 (2022) (quotation omitted and emphasis added). *Bruen* reiterated twice that the "*only*" way the government can justify a modern regulation is with historical tradition. *Id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second

Amendment's unqualified command.") (quotation marks omitted and emphasis added); *id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment … does not protect petitioners' proposed course of conduct.") (emphasis added).

The *Bruen* Court specifically applied its text-and-history test when considering a regulation deemed "presumptively lawful" in *Heller*. New York "attempt[ed] to characterize [its] proper-cause requirement as a 'sensitive-place' law." *Bruen*, 597 U.S. at 30. Regardless of any presumption, the Court consulted "the historical record" to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Id.* at 30–31. *Bruen* thus held the "presumptively lawful" "sensitive place" regulation to the same standard that applies to all firearm regulations.

*Bruen*'s treatment of the "sensitive place" regulation is consistent with *Heller*, which conveyed that "presumptively lawful" regulations must still be historically justified. The *Heller* Court acknowledged that it did "not provid[e] extensive historical justification for those regulations,"

but asserted that "there will be time enough to expound upon the historical justifications" another time. 554 U.S. at 635.

The Court has clearly and repeatedly defined its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition") (citing *Bruen*, 597 U.S. at 26–31). The Court has never articulated an exception for the "presumptively lawful" regulations. Rather, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" protections "*[o]nly if* a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17 (emphasis added). Therefore, prohibitions on the possession of firearms by felons must be historically justified.

## II. Historical tradition supports disarming only dangerous persons.

### A. In colonial America, arms restrictions targeted dangerous persons.

*Bruen* valued colonial laws to the extent that they informed the original understanding of the Second Amendment. 597 U.S. at 46–49.

7

Every ban on firearm possession in colonial America was discriminatory—bans applied to Blacks, American Indians, Catholics, Puritans, and Antinomians. But both *Bruen* and *Rahimi* make clear that discriminatory laws cannot establish a historical tradition. *Bruen* did not consider any historical laws requiring Blacks to acquire discretionary licenses to carry arms when analyzing New York's discretionary licensing law for carrying arms—and many were presented to the Court. *See, e.g.*, Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners at 4–11, July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843. Likewise, *Rahimi* did not consider any discriminatory disarmament laws, despite several *amici* encouraging it to do so. *See, e.g.*, Brief for *Amici Curiae* Second Amendment Law Scholars in Support of Petitioner at 15 n.4, Aug. 21, 2023, *United States v. Rahimi*, No. 22-915. Rather, the Court "has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 590 U.S. 83, 128–29 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221

(2017)). Yet even the discriminatory laws were based on danger, as detailed next.[2]

**Blacks**. Laws preventing Blacks from keeping arms "rested upon White fears that armed Blacks, especially freemen, might conspire to carry out a slave revolt." Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT 440 (3d ed. 2021). Many colonies also enacted laws to ensure that communities were sufficiently armed and organized to suppress slave revolts. Greenlee, *Disarming the Dangerous*, at 28 n.166 (collecting laws). There were approximately 250 slave revolts throughout early American history, and they created constant fear in many colonies. *See* Herbert Aptheker, AMERICAN NEGRO SLAVE REVOLTS 162 (1943).

Blacks could sometimes keep arms, however, if the government deemed them peaceable—and thus unlikely to revolt. *See, e.g.*, 1806 Md. Laws 45 (allowing a "free negro or mulatto to go at large with [a] gun" with "a certificate from a justice of the peace, that he is an orderly and peacable person").

---

[2] The tradition of disarming only dangerous persons in colonial America reflected England's practice at the time. *See* Joseph Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1, 6–26 (2024).

***American Indians.*** Because American Indians were not governed by Britain, most colonial laws restricted arms transfers to Indians rather than possession. Johnson, FIREARMS LAW, at 210–12; *see also Worcester v. State of Ga.*, 31 U.S. 515, 519 (1832) ("The Indian nations had always been considered as distinct, independent political communities[.]"). These restrictions were among the myriad laws intended to prevent attacks. For example, colonies regularly required arms-bearing to church, court, public assemblies, travel, and fieldwork. Johnson, FIREARMS LAW, at 189–91. And every colony enacted militia laws with the stated purpose of defending against Indian attacks. Greenlee, *Disarming the Dangerous*, at 29 n.178 (collecting laws).

The law closest to a possession ban was from the Dutch colony, New Netherland. It "forb[ade] the admission of any Indians with a gun … into any Houses" "to prevent such dangers of isolated murders and assassinations." LAWS AND ORDINANCES OF NEW NETHERLAND, at 234–35. The British did not adopt the law after taking over the colony, but regardless, it targeted people believed to be dangerous.

***Catholics***. Concerns over American Catholics assisting France in a war against the British long pervaded colonial life.

After England's Glorious Revolution, rumors circulated "that the French in Canada were making preparations to invade New York, hoping, with the assistance of the Catholics in the province, to wrest it from the English." Berthold Fernow, *The Middle Colonies*, *in* 5 NARRATIVE AND CRITICAL HISTORY OF AMERICA, Part. I, at 189 (Winsor ed., 1887). New Yorkers were concerned "that the papists within and without the government had concerted to seize Fort James, in New York, and to surrender that post and the province to a French fleet." *Id.* at 189–90. Jacob Leisler "seized the fort" so Catholics could not, and wrested control of the province from James II's appointees, "rising to such prominence" on "a 'No Popery' cry." *Id.* at 190. While Leisler's rule was short-lived, fears over Catholic uprisings remained. After an assassination attempt on King William in 1696, "reputed papists in New York" were "disarmed and bound to give bond for good behaviour or be confined in prison." Letter from Governor Benjamin Fletcher to Lords of Trade and Plantations, June 10, 1696, *in* 15 CALENDAR OF STATE PAPERS, COLONIAL SERIES, AMERICA AND WEST INDIES, 15 MAY, 1696 – 31 OCTOBER, 1697, at 12 (Fortescue ed., 1904).

Pennsylvania and Virginia disarmed Catholics—and Maryland considered it—during the French and Indian War. Pennsylvania's governor worried that "the French might march in and be strengthened by the German and Irish Catholics who are numerous here." CATHOLICITY IN PHILADELPHIA 79 (Kirlin ed., 1909). Justices of the peace petitioned Pennsylvania's governor for authority to disarm Catholics: "that the papists should Keep Arms in their Houses," they argued, leaves "the Protestants … subject to a Massacre whenever the papists are ready." *Id.* at 78. Likewise, a Lieutenant Colonel urged the militia to prevent the "Protestant Government" from being "trodden under foot by the bloody and tyrannical power of Popery." PENNSYLVANIA GAZETTE, June 13, 1754. "[N]umberless enemies amongst us," he warned, "may … rise … in rebellion." *Id.*

Pennsylvania's act disarming Catholics thus provided: "in this time of actual war … it is absolutely necessary … to quell and suppress any intestine commotions, rebellions or insurrections." 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 609 (Ray ed., 1898).

Virginia's law disarming Catholics expressly declared, "it is dangerous at this time to permit Papists to be armed." 7 William Waller

Hening, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35 (1820).

Similar concerns were expressed in Maryland. A 1755 Maryland bill to prohibit "the Importation of German and French Papists, and Popish Priests and Jesuits," expressed a concern that "they will … in Case of an Attack … turn their Force, in Conjunction with the French and their savage Allies, against his loyal Protestant Subjects." 52 ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, 1755–1756, at 89 (Pleasants ed., 1935).

In Maryland newspapers "Popery" was called "a *persecuting, blood shedding* Religion," MARYLAND GAZETTE, Oct. 10, 1754, and "the Foundation of all our present … Dangers," MARYLAND GAZETTE, Oct. 17, 1754. It was argued that "Self-Preservation" requires "Laws as will put it out of the Power of the Jesuits; and their deluded Votaries, to endanger the Peace." *Id.*

In 1753, Maryland's lower house considered testimony "that the Papists very frequently said, they would wash their Hands in the Blood of Protestants." 50 ARCHIVES OF MARYLAND, at 201. In 1754, Maryland's Committee of Grievances warned that "several Papists … have made

great Opposition to the enlisting Men … to repel the Invasion of the French and Indians in Alliance with them." *Id.* at 487. The Committee declared that the "Conduct and Behaviour of the Papists" required action "to secure … against our domestic … Enemies." *Id.*

Maryland's General Assembly passed an act "to quell and Suppress any intestine Commotions Rebellions or Insurrections" that required the confiscation of "all Arms Gunpowder and Ammunition of … any Papist or reputed Papist." 52 ARCHIVES OF MARYLAND, at 450, 454. But the governor declined to sign it. *Id.* at 474–75, 640–41.

Catholics were considered dangerous in several colonies, and the laws disarming them were intended to disarm dangerous persons.

***Puritans***. As the English Civil War raged in part over differences between the Anglican Church and dissenting Puritans, Virginia discriminated against Puritans in the 1640s under the governorship of Charles I's close ally William Berkeley. "[H]aving come from the royal court in 1642," Berkeley "knew that Puritans posed a serious threat to the church and to the royal government." Kevin Butterfield, *Puritans and Religious Strife in the Early Chesapeake*, THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY, vol. 109, No. 1, at 21 (2001).

The royal instructions for Berkeley as governor directed him to ensure that "the form of religion established in the Church of England" was observed throughout the colony and to expel anyone who refused the "Oaths of Allegiance and Supremacy." Evarts Boutell Greene, THE PROVINCIAL GOVERNOR IN THE ENGLISH COLONIES OF NORTH AMERICA 219 (1898). After "most refused to take" the oaths, Joseph Frank, *News from Virginny, 1644*, THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY, vol. 65, No. 1, at 85 (1957) (quoting May 15–22, 1645 newspaper), Massachusetts Puritan leader John Winthrop predicted that Virginia "was like to rise in parties, some for the king, and others for the Parliament," 2 John Winthrop, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, at 160 (Savage ed., 1826). Ultimately, "an armed conflict between the Puritans and the Berkeley camp" was averted by an Indian attack that killed hundreds of Virginians and deterred the survivors from warring among themselves. Butterfield, *Puritans*, at 20. As a London newspaper reported:

> if the Indians had but forborne for a month longer, they had found us in such a combustion among our selves that they might with ease have cut of[f] every man … once we had spent that little powder and shot that we had among our selves.

Frank, *News*, at 86 (quoting May 15–22, 1645 newspaper).

Nevertheless, the conflict in Virginia remained perilous. Puritan leader and preacher William Durand was arrested and his supporters deemed "Abettors to much sedition and Munity." THE LOWER NORFOLK COUNTY VIRGINIA ANTIQUARY, No. 2, Pt. 1, at 15 (James ed., 1897) (statement made in court in May 1648). Many Puritans were soon disarmed and banished from the colony. Charles Campbell, HISTORY OF THE COLONY AND ANCIENT DOMINION OF VIRGINIA 212 (1860).

This episode serves as an early example of disarmament motivated by danger in America.

***Antinomians.*** Anne Hutchinson was convicted of sedition in 1637 Massachusetts for criticizing the Puritan government's legalistic interpretation of the Bible. Hutchinson, John Wheelwright,[3] and some of their Antinomian supporters were banished from the colony. Of those permitted to remain, seventy-five were disarmed,[4] while others who confessed their perceived sins could keep their arms. 1 RECORDS OF THE

---

[3] Wheelwright's wife was the sister of Hutchinson's husband.

[4] An early source lists 76 disarmed supporters, *Johnson's Wonder-Working Providence 1628–1651, in* 7 COLLECTIONS OF THE MASSACHUSETTS HISTORICAL SOCIETY 6 (2d ser., 1818) (1654), but the disarmament order lists 75, 1 RECORDS OF THE GOVERNOR, at 211–12.

GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 1628–1641, at 211–12 (Shurtleff ed., 1853). The disarmament order stated that authorities were concerned that the Antinomians might receive a revelation inspiring them to commit violence:

> Whereas the opinions & revelations of Mr Wheeleright & Mrs Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment, for p[re]vention whereof it is ordered, that all those whose names are underwritten shall … deliver … all such guns, pistols, swords, powder, shot, & match as they shalbee owners of, or have in their custody.… Also, it is ordered … that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, untill this Court shall take further order therein.

*Id.* at 211.

The reference to "Germany, in former times" was seemingly a reference to the Peasants' War of 1524–25, in which leaders of the revolt claimed to be inspired by divine revelations. *See* Norman Cohn, THE PURSUIT OF THE MILLENNIUM: REVOLUTIONARY MILLENNARIANS AND MYSTICAL ANARCHISTS OF THE MIDDLE AGES 248 (1957). Therefore, Hutchinson's supporters were disarmed because the "new erected government … feared breach of peace." *Johnson's Wonder-Working*, at 6.

17

## B. Founding-Era restrictions applied to enemies of the government and other dangerous persons.

"[N]ot all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" Founding-Era history is paramount. *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s).

***Revolutionary War loyalists.*** Loyalists during the Revolutionary War were enemies of the government in a violent conflict. "During the course of the American Revolution, over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British Army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES.[5] "[W]e may safely say that 50,000 soldiers, either regular or militia, were drawn into the service of Great Britain from her American sympathizers." Mark Boatner, ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 663 (3d ed. 1994). Additionally, insurrections were frequent. Greenlee, *Disarming the Dangerous*, at 52–

---

[5] https://perma.cc/C6HP-WBPL.

61. Thus, authorities repeatedly stated that the reason for disarming loyalists was dangerousness:

- Massachusetts's Congress disarmed loyalists so they could not "join with the open and avowed enemies of America" to inflict "ruin and destruction … against these Colonies." 2 AMERICAN ARCHIVES 793 (4th Ser., Force ed., 1839) (May 1775).

- General Washington wrote to General Lee: "The Tories should be disarmed immediately though it is probable that they may have secured their arms … until called upon to use them against us." 4 *id.* at 895 (January 1776).

- "[T]o frustrate the mischievous machinations, and restrain the wicked practices of these men" who "have taken part with our oppressors," the Continental Congress "recommended" that "they ought to be disarmed." *Id.* at 1629 (January 1776).

- Governor Trumbull wrote to General Schuyler: "I do sincerely congratulate you on … disarming the Tories…. Suppressing such enemies … is of very great importance." *Id.* at 899 (January 1776).

19

- Translator James Deane informed the Six Nations that loyalists were disarmed because they "were preparing themselves for war against us—that they had procured arms, and would attack us with the first favourable opportunity." *Id.* at 855 (January 1776).

- New York's Congress deemed it "absolutely necessary, not only for the safety of the … Province, but of the United Colonies in general, to take away the arms and accoutrements of the most dangerous among [the loyalists]." 5 *id.* at 1504 (May 1776).

- New Jersey's Congress, because "a number of disaffected persons have assembled … preparing, by force of arms … to join the British Troops for the destruction of this country," disarmed "these dangerous Insurgents." 6 *id.* at 1636 (July 1776).

- Pennsylvania noted "the folly and danger of leaving arms in the hands of Non-Associators" when disarming them. 2 *id.* (5th. Ser.) at 582–83 (September 1776).

- New Jersey empowered its Council of Safety "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and

Ammunition which they own or possess." 1777 N.J. Laws 90, ch. 40 §20 (September 1777).

- Pennsylvania determined that "it is very improper and dangerous that persons disaffected … shall possess … any firearms," so it "empowered [militia officers] to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state." THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA 193 (1782) (April 1779).[6]

Disarmament during the war served the additional purpose of supplying arms to unarmed patriot troops when America faced a perilous arms shortage. Greenlee, *Disarming the Dangerous*, at 64–69.

After the war, America's first Secretary of State, Thomas Jefferson, defended confiscating loyalists' property (including arms): "It cannot be denied that *the state of war* strictly permits a nation to seize the property of it's enemies[.]" Letter from Thomas Jefferson to George Hammond,

---

[6] Allowing people to swear loyalty on affirmation accommodated people whose religious convictions precluded oath-taking, such as Quakers.

May 29, 1792, *in* 3 THE WORKS OF THOMAS JEFFERSON 369 (Washington ed., 1884) (emphasis added).

As Jefferson emphasized, the disarmament laws were wartime measures from desperate governments on the brink of destruction—they were not models for constitutional rights. *Cf. Bruen*, 597 U.S. at 63 n.26 (discounting wartime laws because there was "little indication that these military dictates were designed to align with the Constitution's usual application during times of peace"). Indeed, General Lee demonstrated the lack of concern for rights—or morality—when he proposed that a better alternative to disarming loyalists was "to secure their children as hostages." 5 AMERICAN ARCHIVES, 4th Ser., at 1385. At most, therefore, Revolutionary War disarmament is relevant only to the extent that even during a time of existential conflict it continued the limited tradition of disarming dangerous persons.

***Shays's Rebellion.*** In Shays's Rebellion, armed bands in 1786 Massachusetts attacked courthouses, the federal arsenal in Springfield, and other government properties, leading to a military confrontation with the Massachusetts militia on February 2, 1787. *See* John Noble, A FEW NOTES ON THE SHAYS REBELLION (1903). After the rebellion was

defeated, Massachusetts pardoned individuals who bore "arms against the authority and Government of this Commonwealth" or aided the rebellion, under the condition that they "deliver up their arms" to the government and wait three years to reclaim them. 1787 Mass. Acts 555–56 (Acts & Laws, January Session, passed February 16, 1787). But the rebels were ultimately permitted to reclaim their arms within four months. 1787 Mass. Acts 13–14 (Resolves, June Session).

***Ratification proposals.*** Three proposals from the Constitution ratifying conventions addressed who may be barred from possessing arms. Only New Hampshire's was approved by a majority of its convention. It provided, "Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion." 28 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 378 (Kaminski et al. eds., 2017).

In Massachusetts, Samuel Adams's proposal ensured "that the said constitution be never construed … to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 *id.* at 1453. In the Founding Era, "peaceable" meant the same as today: nonviolent. Being "peaceable" is not the same as being "law-abiding,"

because the law may be broken nonviolently. Samuel Johnson's dictionary defined "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed. 3. Not violent; not bloody. 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773) (unpaginated). Thomas Sheridan's dictionary defined "peaceable" as "Free from war, free from tumult; quiet, undisturbed; not quarrelsome, not turbulent." Thomas Sheridan, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 438 (2d ed. 1789). According to Noah Webster's dictionary, "peaceable" meant "Not violent, bloody or unnatural." 2 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). *Heller* relied on Johnson, Sheridan, and Webster to interpret the Second Amendment's text.[7]

Although not approved by a majority, many Massachusetts convention members ratified the Constitution with the understanding that Adams's amendments would follow. *See* 6 DOCUMENTARY HISTORY, at 1476 (John Hancock: "I give my assent to the Constitution in full confidence that the amendments proposed will soon become a part of the

---

[7] For Johnson, *see Heller*, 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 ("bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

system."). And Adams's supporters later celebrated the Second Amendment as the adoption of Adams's proposal. *Id.* at 1453–54.

A third proposal came from Pennsylvania's "Dissent of the Minority." Of the 23 members of Pennsylvania's 69-member convention who voted against ratification, 21 signed the Dissent. 2 *id.* at 617. It proposed amendments, including that "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *Id.* at 624.

No evidence suggests that "crimes committed" included nonviolent crimes; the only discussion of what the proposal included said it covered insurrectionists.[8] Since disarmament laws traditionally focused on danger, "crimes committed" likely covered violent crimes, while "real

---

[8] Pennsylvania reverend Nicholas Collin, under the pseudonym "Foreign Spectator," wrote: "Insurrections against the federal government are undoubtedly real dangers of public injury, not only from individuals, but great bodies; consequently the laws of the union should be competent for the disarming of both." *No. XI*, FEDERAL GAZETTE, Nov. 28, 1788.

danger of public injury" provided a catchall for violence not covered by the law.[9]

None of the 10 states that ratified the Constitution after the Dissent of the Minority was published—including New Hampshire and Massachusetts—proposed an amendment allowing nonviolent persons to be disarmed. And Samuel Adams apparently interpreted the Dissent of the Minority as protecting peaceable persons—including nonviolent criminals—from disarmament. According to Bostonian Jeremy Belknap, who recognized that Adams's proposal secured "the right of peaceable citizens to bear arms," 7 *id.* at 1583, "it is supposed A[dams] had a copy" of the Dissent of the Minority and based his amendments on it, because his amendments "proposed to guard against" the "*very things*" the Dissent of the Minority "objected to," 5 *id.* at 820. Adams's proposal forbade disarmament for anyone but dangerous persons. 6 *id.* at 1453.

All the evidence suggests that the Dissent of the Minority was not advocating for the first-ever prohibition for non-dangerous crimes or conduct. If so, that view was limited to *some* dissenters in the *minority* of

_____

[9] *E.g.*, three men who confessed to raping a child in 1641 avoided the death penalty because Massachusetts law did not expressly proscribe such conduct. Winthrop, HISTORY, at 45–48.

*one state*'s convention. But the more reasonable interpretation is that the Dissent of the Minority covered only violent crimes.

### C. Nineteenth-century arms prohibitions applied to slaves and freedmen, while lesser restrictions focused on dangerous persons.

While 19th-century evidence "is instructive," it does "not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Heller*, 554 U.S. at 614. Accordingly, "we must … guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35.

***Discriminatory laws.*** Many 19th-century restrictions on arms possession were discriminatory bans on slaves and freedmen. *See, e.g.*, 1851 Ky. Acts 296; 1863 Del. Laws 332. As explained above, these are not valid analogs. Nonetheless, as Horace Greeley explained in 1867, "[i]t was not deemed compatible with public safety that blacks should be allowed to keep and use arms like white persons." James Parton, THE LIFE OF HORACE GREELEY, EDITOR OF THE NEW YORK TRIBUNE 535 (1869).

***Tramps.*** Tramps—typically defined as males begging for charity outside their home county—were sometimes forbidden to bear arms in

the latter half of the 19th century.[10] These restrictions were based on the contemporaneous concern for the dangers presented by tramps, but more acutely, tramping was not a homebound activity, so the restrictions did not prohibit keeping arms in the home.

Ohio's Supreme Court upheld one such restriction because "the constitutional right to bear arms … was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 63 Ohio St. 202, 218–19 (1900). Leaving no doubt that tramps were considered dangerous persons, the court called "the genus tramp" "dangerous," "a public enemy," and "a thief, a robber, often a murderer," who uses "vicious violence" to "terroriz[e] the people"—including "unprotected women and children." *Id.* at 215–16.

Indeed, tramps were "an object of fear," who were "accused … of every conceivable crime" and "probably the most common and widespread

---

[10] 2 THE GENERAL LAWS OF THE STATE OF CALIFORNIA FROM 1850 TO 1864, INCLUSIVE 1076–77 (Hittell ed., 1868) (but providing exception for "peaceable and quiet persons"); 1878 N.H. Laws 170; 1878 Vt. Acts & Resolves 30; 1879 Conn. Pub. Acts 394; 1879 Wis. Sess. Laws 274; 1879 Del. Laws 225; 1879 N.C. Sess. Laws 355; 1879 Ohio Laws 192; 1879 Pa. Laws 34; 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, §2964 (1880); 1880 N.Y. Laws 297; 1880 R.I. Acts & Resolves 110; 1890 Iowa Acts 69.

of all nineteenth-century bogeymen." Lawrence Friedman, CRIME AND PUNISHMENT IN AMERICAN HISTORY 102 (1993).

***Persons of unsound mind and intoxicated persons.*** Some laws restricted the acquisition or carry of weapons by persons who were intoxicated or of unsound mind. *See, e.g.*, 1868 Kan. Sess. Laws 378 (forbidding carry by "any person under the influence of intoxicating drink"); 1878 Miss. Laws 175–76 (prohibiting sales to anyone "in a state of intoxication"). As the Kansas Supreme Court noted, persons of unsound mind were considered dangerous: "Can it be said that a Winchester rifle or repeating shotgun, placed in the hands of an insane or [mentally] incompetent person, is not a weapon that is inherently dangerous to himself and his associates? The answer is obvious." *Parman v. Lemmon*, 119 Kan. 323, 244 P. 227, 229 (1925) (Discussing 1883 restriction on transfers of weapons "to any person of notoriously unsound mind." 1883 Kan. Sess. Laws 159). Likewise, the Missouri Supreme Court noted that a law forbidding intoxicated persons to carry certain weapons was intended to prevent "[t]he mischief to be apprehended from an intoxicated person." *State v. Shelby*, 90 Mo. 302, 2 S.W. 468, 469 (1886).

***Rebels.*** In 1867, Kansas forbade "any person who has ever borne arms against the Government" from carrying certain arms. 1867 Kan. Sess. Laws 25.

***Surety laws.*** Several states enacted laws requiring people likely to endanger the public to find sureties before carrying arms. *Bruen*, 597 U.S. at 56 n.23 (collecting laws). These laws "applie[d] to individuals found to threaten the physical safety of another." *Rahimi*, 602 U.S. at 698.

Restrictions in the 19th century therefore continued the earlier tradition of targeting demonstrably dangerous persons. By contrast, officials and commentators frequently recognized that peaceable persons could not be disarmed. A Rhode Island state convention resolved that "the Constitution of the United States" forbade "taking from peaceable citizens their arms." WEEKLY GLOBE, Dec. 10, 1842, at 15. Joseph Gales, the widely read senior editor of the National Intelligencer and a Washington D.C. mayor, recognized the right of the "peaceable citizen" to carry arms, but not "the lawless ruffian." Oliver Smith, EARLY INDIANA TRIALS AND SKETCHES 466 (1858). During Bleeding Kansas, antislavery advocates decried Second Amendment violations when a pro-slavery

sheriff "entered the houses of peaceable citizens and demanded that they should deliver up their arms," NEW-YORK DAILY TRIBUNE, Oct. 2, 1856, at 4, and when a large body of "[p]eaceable American [c]itizens" had their arms "seized" by federal troops, HOLMES COUNTY REPUBLICAN, Oct. 30, 1856, at 1. A petition to impeach President Franklin Pierce asserted that he "trampled the Constitution of the United States" by "us[ing] the military … to take from peaceable citizens of [Kansas] the 'right to keep and bear arms.'" THE LIBERATOR, Aug. 22, 1856, at 140. During the Civil War, Mississippi's Governor ordered undercover Union soldiers to disarm a population sympathetic to the Union, but they "did not comply because it was unconstitutional to disarm peacable citizens." R.W. Surby, GRIERSON RAIDS 253 (1865). After the war, a Kansas newspaper cited the "constitutional right of every peaceable citizen to carry arms for his own defense." THE TOPEKA DAILY CAPITAL, Feb. 2, 1883, at 6. In short, America's historical tradition establishes that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, THE STATESMAN, OR PRINCIPLES OF LEGISLATION AND LAW 186 (1840).

## III. Nonviolent felons and other "unvirtuous" persons were expressly permitted and often required to keep arms.

Historically, no individual was disarmed because the law they violated was classified as a felony. Moreover, upon completing their sentences, offenders not only had full Second Amendment rights, but able-bodied males were *required to keep and bear arms* under the state and federal militia acts. *See* 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Parts 1–14 (Vollmer ed., 1947) (compiling Colonial- and Founding-Era militia acts). While militia laws occasionally provided exemptions for people employed in certain professions, *see, e.g.*, 1 Stat. 271, §2 (1792) (federal Uniform Militia Act providing exemptions for elected officials, post officers, stage-drivers, ferrymen, inspectors, pilots, and mariners), no militia law in the Colonial or Founding periods provided any exemption based on prior incarceration or crimes committed.[11] Thus, freemen previously convicted

---

[11] Felons were not always executed, and regularly reentered society—and thus, resumed militia duty. "At the common law, few felonies, indeed, were punished with death," James Wilson explained soon after his appointment to the first United States Supreme Court. 2 THE WORKS OF JAMES WILSON 348 (Andrews ed., 1896). For example, larceny—"the felonious and fraudulent taking and carrying away of the personal goods of another," *id.* at 379—was not a capital offense under

of crimes virtually always possessed arms in the Colonial and Founding Eras.

Additionally, several Colonial- and Founding-Era laws expressly protected criminals' arms. In 1786 Massachusetts, estate sales were held to recover funds stolen by corrupt tax collectors and sheriffs. But it was forbidden to include "arms" in the sales. 1786 Mass. Acts 265.

Laws exempting arms from civil action recoveries—which undoubtedly benefited some unvirtuous persons—existed since 1650 in Connecticut. THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 537 (Trumbull ed., 1850). Maryland and Virginia enacted similar exemptions. 13 ARCHIVES OF MARYLAND, at 557 (1692 Maryland); 30 *id.* at 280 (1715

---

the laws of the United States or Pennsylvania, *id.* at 383. The First Congress made larceny punishable by a "fine" and a "public[] whipp[ing], not exceeding thirty-nine stripes." 1 THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA 116 (Peters ed., 1845). Under Pennsylvania's 1790 law, anyone who shall "feloniously steal, take and carry away any goods or chattels, under the value of twenty shillings" could be "sentenced to undergo a servitude for a term not exceeding one year." 2 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN 532 (1810). Someone convicted of "larceny to the value of twenty shillings and upwards" could be "confined [and] kept to hard labour" for three years. *Id.*

Maryland); 3 Hening, STATUTES, at 339 (1705 Virginia); 4 *id.* at 121 (1723 Virginia). And the federal Uniform Militia Act in 1792 exempted militia arms "from all suits, distresses, executions or sales, for debt or for the payment of taxes." 1 Stat. 271, §1 (1792).

## CONCLUSION

There is no historical tradition of disarming nonviolent felons. The district court's order should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION –
INSTITUTE FOR LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org
*Counsel of Record*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 29 because this brief contains 6,134 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on May 7, 2026, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*